UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> BOARD OF DIRECTORS OF ) <br> SPECIAL SCHOOL DISTRICT ) <br> NO. 1, MINNEAPOLIS PUBLIC ) <br> SCHOOLS, ) <br> ) <br> SPECIAL SCHOOL DISTRICT ) <br> NO. 1, THE MINNEAPOLIS ) <br> PUBLIC SCHOOLS, ) <br> ) <br> and ) <br> ) <br> LISA SAYLES-ADAMS, ) <br> SUPERINTENDENT ) <br> ) <br> Defendants. ) | Civil Action No. _____ <br><br> Jury demand |

**COMPLAINT**

INTRODUCTION

The United States brings this action to stop the Board of Directors of Special School District No. 1, Minneapolis Public Schools (Board), Special School District No. 1, the Minneapolis Public Schools (MPS), and MPS Superintendent Lisa Sayles-Adams (collectively, Defendants) from discriminating against teachers based on their race, color, sex, and national origin in violation of federal law. Since at least July 1, 2021, Defendants have contracted with a teacher's union to provide black teachers, teachers of color, and "underrepresented" teachers preferential treatment in employment decisions—such as

1

involuntary reassignments, layoffs, and reinstatements—based on their race, color, sex, and national origin. This preferential treatment is plainly discriminatory and unlawful.

The Defendants' collective bargaining agreement (CBA) with the union requires Defendants to "excess" or involuntarily reassign teachers based on seniority *unless* a teacher is "underrepresented." In that case, the CBA requires Defendants to skip the "underrepresented" teacher and "excess" or reassign a "non-underrepresented" teacher instead. Defendants' CBA also requires them to reinstate "underrepresented" teachers first, ignoring seniority order and the order in which the "excessing" or layoffs occurred. The CBA further allows Defendants to exempt "underrepresented" teachers from layoffs. Defendants' unlawful classification of, and discrimination against, their "non-underrepresented" teachers is even more manifest in its Memorandum of Agreement with a third party called "Black Men Teach" included in the CBA. Defendants offer "Black Men Teach Fellows" extra paid training days and exempt them from normal layoff policies. Of course, only black men can be "Black Men Teach Fellows," so women, whites, Asians, and others need not apply.

While Defendants claim that these provisions are to stop discrimination, they require Defendants to blatantly discriminate against teachers based on their race, color, sex, and national origin. "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). The United States brings this action to stop Defendants from engaging in race- and sex-based discrimination and thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action under 42 U.S.C. § 2000e-6(b) and 28 U.S.C. §§ 1331, 1343(a)(3), and 1345.

2. Venue is proper in the United States District Court for the District of Minnesota pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to this action occurred in this judicial District of Minnesota.

## PARTIES

3. Plaintiff United States is expressly authorized to bring this action by Section 707 of Title VII, 42 U.S.C. § 2000e-6.

4. Defendant Board of Directors of Special School District No. 1, Minneapolis Public Schools (Board) is a governmental entity created pursuant to Minnesota state law.

5. Defendant Special School District No. 1, the Minneapolis Public Schools (MPS) is a governmental entity created pursuant to Minnesota state law.

6. Lisa Sayles-Adams is the superintendent of MPS. Sayles-Adams is sued in her official capacity.

7. The Board is a "person" within the meaning of 42 U.S.C. § 2000e(a) and an "employer" within the meaning of 42 U.S.C. § 2000e(b).

8. MPS is a "person" within the meaning of 42 U.S.C. § 2000e(a) and an "employer" within the meaning of 42 U.S.C. § 2000e(b).

9. Sayles-Adams is a "person" within the meaning of 42 U.S.C. § 2000e(a) and an "employer" within the meaning of 42 U.S.C. § 2000e(b) who is responsible,

according to Board Policy 2405,[1] for developing the collective bargaining agreement (CBA) at issue in this litigation, submitting the CBA for Board approval, and implementing the CBA.

## FACTS

10. Since at least July 1, 2021, Defendants have had a CBA with the Minneapolis Federation of Teachers Local 59 (union).

11. The CBA details many of the terms and conditions of employment under which teachers work in Defendants' schools.

12. Defendants' two most recent CBAs with the union had effective dates of July 1, 2021, through June 30, 2023, (2021–23 CBA) and July 1, 2023, through June 30, 2025, (2023–25 CBA) (collectively, CBAs).[2]

13. The 2023–25 CBA was ratified on May 14, 2024.[3] Currently, Defendants and the union have not ratified a new CBA, and they are operating under a continuation of the 2023–25 CBA.

14. The CBAs promote the use of an "Anti-Bias Anti-Racist Educator Development and Advisory Council (Council)." According to the CBAs, the Council has

---

[1] *See* Board Policy 2405: Employee Compensation, *available at* https://perma.cc/VN2R-YUVY.

[2] Employee Relations and Collective Bargaining: Collective Bargaining Agreement with Minneapolis Federation of Teachers Local No. 59, Minneapolis Public Schools, *available at* https://perma.cc/L4BY-EWWW.

[3] *See* May 14, 2024 Regular Business Meeting Minutes, *available at* https://perma.cc/CX6U-AWQM.

"a committed focus on reducing inequitable practices and behaviors in our learning places and spaces as well as supporting educators, specifically educators of color, in navigating and disrupting our District as a predominantly white institution." 2021–23 CBA § 3.5.7; 2023–25 CBA § 3.4.7.

15. Defendants seek to "disrupt[] [the] District as a predominantly white institution," *id.*, through CBA provisions that provide employment preferences based on race, color, or national origin.

16. According to the 2023-25 CBA, one of the Council's purposes is to "[r]eview and consult on culturally responsive support for Black, Indigenous, and People of Color (BIPOC) educators to increase retention and success." 2023–25 CBA § 3.4.7(b).

17. The 2023-25 CBA further provides that "[a] core component of the Council is the Anti-Bias Anti-Racist subcommittees specifically tasked with recommending establishing initiatives for recruitment, retention, and development of educators of color . . . [.]" *Id.* § 3.4.7(d).

18. "Educators of color" is a reference to a teacher's race, color, or national origin. *See id.* at 235 (discussing Defendants' "commitment to recruiting and retaining educators of color . . . specifically . . . Black male educators").

19. "Underrepresented populations" is a proxy for a teacher's race, color, or national origin.

20. Upon information and belief, the terms "educators of color" includes BIPOC[4] individuals, otherwise known as black, indigenous, and people of color.

21. Upon information and belief, "underrepresented populations" include BIPOC individuals, otherwise known as black, indigenous, and people of color.

22. Defendants have set specific, percentage-based goals for their hiring and retention of BIPOC staff and teachers. Defendants' 2023-2026 Achievement and Integration Plan seeks to "increase [their] BIPOC staffing" from 37.6% in 2023 to "at least 40% by 2026."[5] And Defendants' May 2025 strategic plan progress report sets a goal that by 2026-27, "54.3% of new [teacher] hires identify as Black, Indigenous, and People of Color (BIPOC)."[6]

23. The provisions of the CBAs exempting "underrepresented" teachers from adverse employment actions serve Defendants' goals for increasing the number of "BIPOC" teachers and staff.

---

[4] *The school strike aimed to protect BIPOC teachers. Instead, some feel 'ostracized,'* North News, Apr. 23, 2022, *available at* https://perma.cc/F69W-G8WM (noting that Minneapolis teachers' union leaders drafted, for inclusion in the 2021-23 CBA, a memorandum of agreement "with a contractual commitment for exempting BIPOC teachers from layoff"); *School district sued over keeping teachers of color in the classroom*, Southwest Voices, Aug. 25, 2022, *available at* https://perma.cc/8FSF-G8LE (describing how "BIPOC union members" organized in 2022 to reverse the Minneapolis teachers' union's decision to remove exemption language designed to "protect teachers from underrepresented groups from seniority-based layoffs and excessing").

[5] *Achievement & Integration Updates*, Minneapolis Public Schools at 7, *available at* https://perma.cc/DE7S-3SPS.

[6] *Effective Staff,* Minneapolis Public Schools, May 2025 Progress Report at 2, *available at* https://perma.cc/6V88-Y9HM.

6

24. In service of Defendants' stated goal of increasing BIPOC teachers, the CBAs grant employment privileges to teachers who are members of "underrepresented populations" based on their race, color, or national origin that are not granted to teachers who are not members of an underrepresented population.

### Article 15 of the CBA Obligates Defendants to Classify, Limit, and Discriminate Against Teachers

25. Article 15 of the 2021-23 and 2023-25 CBAs establish Defendants' contractual obligations when excessing, including involuntarily reassigning; laying off; and reinstating teachers. 2023–25 CBA at 200–20.

26. The stated goal of Article 15 is to "to facilitate the best match possible of teachers and sites or programs seeking teachers." *Id.* § 15.1.1.

27. Article 15 purports "to remedy the continuing effects of past discrimination by the District . . . [that] disproportionately impacted the hiring of underrepresented teachers in the District, as compared to the relevant labor market and the community, and resulted in a lack of diversity of teachers." *Id.* § 15.1.2(i).

28. Article 15 further provides that its "diversity"-related provisions "will no longer be in effect once the teachers in the District reflect the diversity of the labor market and the community served by the District." *Id.* § 15.1.2(i).

29. Upon information and belief, Defendants' claim that "past discrimination . . . resulted in a lack of diversity of teachers" is not supported by any analytical process or factual basis. Rather, Defendants justified this claim by bluntly stating that it was

7

included as part of the negotiation process with the union. No other factual or analytical justification supports this claim.

30. Based on no evidence, Defendants assumed that they had a problem with teacher representation stemming from past discrimination and imposed multiple race-, color-, and national origin-based classifications, terms, and conditions of employment on its teachers.

### Defendants Classify and Limit Teachers Based on Race, Color, and National Origin for "Excessing" and Involuntary Reassignment

31. The 2023-25 CBA establishes general procedures for "excessing" teachers. A teacher is in "excessed" status when a school or job site undergoes staff reductions, when a teacher returns from a leave of absence longer than a year, or when a teacher waives their right to return to a job before taking leave longer than a year. *Id.* § 15.2.5(a).

32. The 2023–25 CBA generally obligates Defendants to conduct staff reductions through "excessing" based on seniority classification; Defendants are required to "excess" a junior teacher before a teacher with more seniority. *Id.* § 15.2.5(b), ¶ 1.

33. Despite this general policy, Article 15 obligates Defendants to disregard seniority order for "excessing" depending on the teacher's race, color, or national origin. Defendants must exempt teachers from an "underrepresented population" from traditional "excessing" by seniority order. Instead of "excessing" an "underrepresented" teacher, Article 15 requires Defendants to "excess" "the next least senior teacher, who is not a member of an underrepresented population." *Id.* § 15.2.5(b), ¶ 3.

8

34. Article 15 of the 2023–25 CBA also establishes Defendants' procedure for "excessing" teachers through involuntary reassignment. If Defendants determine that greater than normal staff reduction is required in a particular school building, and an insufficient number of teachers volunteer for reassignment, Defendants use the involuntary reassignment process. *Id.* §§ 15.9.2(a), 15.9.2(d).

35. Article 15 generally obligates Defendants to conduct involuntary teacher reassignments based on seniority classification; Defendants are required to involuntarily reassign the least senior teachers first. *Id.* § 15.9.2(d), ¶ 1.

36. Despite this general policy, Article 15 obligates Defendants to disregard seniority order for involuntary reassignments depending on the teacher's race, color, or national origin. Defendants must exempt teachers from an "underrepresented population" from the traditional procedure of involuntarily reassigning teachers by seniority order. Instead of reassigning an "underrepresented" teacher, Article 15 requires Defendants to reassign "the next least senior teacher, who is not a member of an underrepresented population." *Id.* § 15.9.2(d), ¶ 3.

37. Defendants' 2023–25 CBA memorializes policies that use teachers' race, color, and national origin to determine whom to excess or involuntarily reassign.

38. Defendants' 2023–25 CBA contractually obligates Defendants to consider teachers' race, color, and national origin when determining whom to excess or involuntarily reassign.

39. Defendants' 2023–25 CBA contractually obligates Defendants to classify teachers by race, color, and national origin to determine whom to "excess" or involuntarily reassign.

40. Defendants' 2023–25 CBA contractually obligates Defendants to limit the ability of teachers who are not members of an "underrepresented population" to avoid "excessing" or involuntary reinstatement, because of their race, color, or national origin.

41. Defendants' 2023–25 CBA contractually obligates Defendants to discriminate against teachers based on race, color, and national origin when "excessing" or involuntarily reassigning teachers.

42. Pursuant to the 2023–25 CBA, Defendants classify teachers by race, color, and national origin for purposes of "excessing" and involuntary reassignment decisions.

43. Pursuant to the 2023–25 CBA, Defendants limit the ability of teachers who are not members of an "underrepresented population" to avoid "excessing" or involuntary reassignment, because of their race, color, or national origin.

**Defendants Classify and Limit Teachers Based on Race, Color, and National Origin for Reinstatement**

44. Article 15 of the 2023–25 CBA establishes Defendants' procedure for reinstating teachers who have been laid off. *Id.* § 15.10.7.

45. Article 15 generally obligates Defendants to reinstate laid-off teachers "in the inverse order of placement on layoff." *Id.* § 15.10.7(d).

46. Despite this general policy, Article 15 obligates Defendants to preference teachers for reinstatement depending on their race, color, or national origin. Defendants

must exempt teachers from an "underrepresented population" from the traditional procedure of reinstating teachers in the inverse order in which they were laid off. Instead of reinstating teachers in chronological layoff order, Article 15 requires that Defendants "shall prioritize the recall of a teacher who is a member of a population underrepresented among licensed teachers in the District." *Id.* § 15.10.7(d), ¶ 2. To elevate the "underrepresented" teacher's recall prospects, Article 15 accordingly requires Defendants to "deprioritize [a] more senior teacher, who is not a member of an underrepresented population, in order to recall a teacher who is a member of a population underrepresented among licensed teachers." *Id.* § 15.10.7(d), ¶ 2.

47. Defendants' 2023–25 CBA memorializes policies that require Defendants to use teachers' race, color, and national origin when determining whom to reinstate.

48. Defendants' 2023–25 CBA contractually obligates Defendants to "deprioritize" one group of teachers for reinstatement while prioritizing another—all based on the teachers' race, color, and national origin.

49. Defendants' 2023–25 CBA contractually obligates Defendants to classify teachers by race, color, and national origin when determining which teachers to reinstate.

50. Defendants' 2023–25 CBA contractually obligates Defendants to limit the ability of teachers who are not members of an "underrepresented population" to be reinstated, because of their race, color, or national origin.

51. Defendants' 2023–25 CBA contractually obligates Defendants to discriminate against teachers based on race, color, and national origin when determining which teachers to reinstate.

52. Pursuant to the 2023–25 CBA, Defendants classify teachers by race, color, and national origin for purposes of teacher reinstatement decisions.

53. Pursuant to the 2023–25 CBA, Defendants limit the ability of teachers who are not members of an "underrepresented population" to be reinstated, because of their race, color, or national origin.

**Defendants Classify and Limit Teachers Based on Race, Color, and National Origin for Layoff Exemptions**

54. Article 15 of the 2023-25 CBA establishes Defendants' procedure for teacher layoffs. *Id.* § 15.10.

55. Article 15 generally obligates Defendants to follow certain non-racial preferences when determining the order of layoffs. Teachers who are not members of the bargaining unit must be laid off before bargaining unit members. *Id.* § 15.10.4(a). Out-of-field permission teachers (those who are teaching outside of their licensure field) must be laid off before licensed teachers. *Id.* § 15.10.4(b). Non-bargaining unit teachers and non-tenured licensed teachers are laid off before tenured teachers. *Id.* § 15.10.4(c). And tenured teachers can be laid off only in inverse seniority order. *Id.* § 15.10.4(c).

56. Despite this general policy, Article 15 permits Defendants to disregard seniority order and exempt certain groups of teachers from layoff "to ensure continuity of instruction" at certain schools and programs. *Id.* § 15.10.12. These groups include teachers at Racially Isolated Schools, Montessori and Immersion schools, and teachers working in Native and Heritage language literacy programs.

12

57. The 2023–25 CBA also permits Defendants to exempt "[t]eachers who are members of populations underrepresented among licensed teachers in the District" from layoff, a classification based solely on the race, color, or national origin of the teacher. *Id.* § 15.10.12(f). A teacher's race, color, or national origin is unrelated to the school or program at which the teacher works.

58. Defendants' 2023–25 CBA permits Defendants to classify teachers by race, color, and national origin when determining which teachers to exempt from layoff.

59. Defendants' 2023–25 CBA permits Defendants to limit the ability of teachers who are not members of an "underrepresented population" to avoid layoff, because of their race, color, or national origin.

60. Defendants' 2023–25 CBA permits Defendants to make teacher layoff decisions based on race, color, and national origin.

### **Defendants Classify, Limit, and Discriminate Against Teachers Based on Race, Color, National Origin, and Sex Through the "Black Men Teach" Memorandum of Agreement**

61. Defendants' 2023-25 CBA includes a memorandum of agreement (MOA) with an organization called "Black Men Teach" (BMT). 2023–25 CBA at 235.

62. BMT's stated goal is "to build and engage a fellowship of Black male educators."[7]

63. To be a member of BMT, otherwise known as a "BMT Fellow," a teacher must be black and male.

---

[7] *Black Men Teach*, What We Do: Our Theory of Action, *available at* https://perma.cc/UYA9-6NGV.

64. Defendants' BMT MOA begins by noting that MPS and Local 59 "share a deep commitment to recruiting and retaining educators of color in order to remedy past, present, and continuing effects of discrimination in MPS hiring practices, specifically towards Black male educators, as they work to increase and retain teachers who reflect the diversity of the community served by the District . . . [.]" 2023–25 CBA at 235.

65. The BMT MOA further states that "MPS is in partnership with Black Men Teach, an organization which is committed to addressing all barriers faced by Black male educators and supports the growth of Black male educators in MPS." *Id.*

66. The BMT MOA establishes MPS' Nellie Stone Johnson Community School (NSJ) as "a partnership elementary school with Black Men Teach (BMT)." *Id.*

67. The BMT MOA clarifies that "BMT Fellows may interview for and be offered teaching positions at NSJ concurrent to the timeline for internal [MPS] employees." *Id.*

68. Upon information and belief, BMT Fellows interview for positions at NSJ separately from all other external female and non-black applicants. Upon information and belief, Defendants offer BMT Fellows positions at NSJ separately from any offers Defendants make to external female and non-black applicants.

69. Pursuant to the 2023–25 CBA, Defendants are required to exempt "BMT Fellows" from the CBA's general provisions on excessing and layoff detailed in paragraphs 31-43 and 54-60 of this Complaint. *Id.* Defendants therefore are required to exempt both teachers who are members of "underrepresented populations" *and* BMT

Fellows from their seniority-based or general policies on excessing, *id.* § 15.2.5(b), involuntary reassignment, *id.* § 15.9.2(d), and reinstatement, *id.* § 15.10.7(d).

70. The BMT MOA also obligates Defendants to provide "BMT Fellows" with "five (5) days per year of reserve teacher coverage, with no loss of pay or benefits, to participate in BMT-sponsored professional development events." 2023–25 CBA at 235.

71. Under the BMT MOA, female and non-black teachers cannot receive the same employment benefits that BMT Fellows receive. External female and non-black applicants cannot interview alongside BMT Fellows for positions at NSJ. And when Defendants make hiring decisions at NSJ, they group the applicants into (1) a BMT Fellows pool, and (2) a pool of female and non-black applicants. Neither are female and non-black teachers exempt from Defendants' general policies on excessing, involuntary reassignment, reinstatement, or layoff like BMT Fellows are. Finally, female and non-black teachers do not receive five extra paid professional development days like BMT Fellows.

72. The BMT MOA obligates Defendants to classify teachers by race, color, national origin, and sex when determining which teachers to exempt from "excessing" and layoff, which teachers to interview for positions at NSJ, and whether to award additional paid professional development days to BMT Fellows.

73. The BMT MOA obligates Defendants to limit the ability of teachers who are not BMT Fellows to receive employment benefits, or otherwise adversely affect non-BMT Fellows' status as employees, because of their race, color, sex, or national origin.

74. The BMT MOA obligates Defendants to discriminate against teachers based on race, color, national origin, and sex by preferencing black male teachers for hiring at NSJ, by exempting black male teachers from "excessing" and layoff, and by awarding black male teachers five extra days of paid reserve teacher coverage for professional development.

75. Pursuant to the 2023–25 CBA, Defendants classify teachers by race, color, national origin, and sex when making hiring decisions at NSJ, when deciding which teachers to "excess" or lay off, and when deciding which teachers to award extra paid reserve teacher coverage for professional development.

76. Pursuant to the 2023–25 CBA, Defendants limit the ability of teachers who are not black men to be hired at NSJ, to avoid "excessing" or layoff, and to receive extra paid reserve teacher coverage for professional development, because of their race, color, sex, or national origin.

77. Pursuant to the 2023–25 CBA, Defendants discriminate against teachers who are not black men by awarding black men the hiring preference and employment benefits provided for in the BMT MOA—preferences and benefits unavailable to any other race or gender.

## COUNT I
### Title VII, 42 U.S.C. § 2000e-2(a)(2)
### Limitation or classification based on race, color, national origin, and sex

78. The United States realleges and incorporates herein by reference the allegations set forth above in paragraphs 1-77.

79. Since 2023 and until present day, Defendants have engaged in a pattern or practice of discrimination against MPS teachers, in violation of § 703(a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2), by classifying or limiting their employees based on race, color, or national origin, as required under Article 15 of the 2023-25 CBA.

80. Since 2023 and until present day, Defendants have engaged in a pattern or practice of discrimination against MPS teachers, in violation of § 703(a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2), by classifying or limiting their employees based on race, color, national origin, or sex as required under the BMT MOA.

81. The Attorney General has reasonable cause to believe that Defendants' continued contractual obligations to classify or limit employees based on race, color, national origin, and sex under the 2023-25 CBA violate Section 703(a)(2) and are "a pattern or practice of resistance to the full enjoyment of" the rights of MPS teachers to equal employment opportunities without discrimination based on race, color, national origin, or sex. *See* Section 707(a) of Title VII, as amended, 42 U.S.C. § 2000e-6(a).

82. The United States, through the United States Department of Justice, notified Defendant MPS of the United States' determination that Defendants' pattern or practice of classification based on race, color, national origin, and sex is unlawful.

## COUNT II
## Title VII, 42 U.S.C. § 2000e-2(a)(1)
## Discrimination in terms or conditions of employment based on race, color, national origin, and sex

83. The United States realleges and incorporates herein by reference the allegations set forth above in paragraphs 1-82.

84. Since 2023 and until present day, Defendants have engaged in a pattern or practice of discrimination against MPS teachers, in violation of § 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1), by implementing preferences based on race, color, national origin, or sex, as required by the BMT MOA.

85. The Attorney General has reasonable cause to believe that Defendants' continued contractual obligations under the BMT MOA to provide "BMT Fellows" with a separate interviewing and hiring process for positions at NSJ, additional protection against "excessing" and layoff, and additional paid professional development days violate Section 703(a)(1) and are "a pattern or practice of resistance to the full enjoyment of" the rights of MPS teachers to equal employment opportunities without discrimination based on race, color, national origin, or sex. *See* Section 707(a) of Title VII, as amended, 42 U.S.C. § 2000e-6(a).

86. The United States, through the United States Department of Justice, notified Defendant MPS of the United States' determination that Defendants' pattern or practice of discrimination based on race, color, national origin, and sex is unlawful.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that this Court enter judgment against Defendants and grant the following relief:

a. A declaratory judgment that Defendants' 2023–25 CBA discriminates against MPS teachers on the basis of race, color, national origin, and sex, in violation of Title VII;

b. A permanent injunction prohibiting Defendants, and their officers, agents, employees, successors, and attorneys, and other persons who are in active concert or participation with Defendants, from further violating Title VII by implementing 2023–25 CBA Article 15 and the BMT MOA on the basis of race, color, national origin, and sex;

c. A permanent injunction prohibiting Defendants, and their officers, agents, employees, successors, and attorneys, and other persons who are in active concert or participation with Defendants, from further violating Title VII by entering into or implementing any contractual provision that is substantially similar to Article 15 or the BMT MOA that limits, classifies, or discriminates against employees based on race, color, sex, or national origin, in any future CBA with the union;

d. An award of any applicable costs and fees; and

e. An award of all such other additional relief as the interests of justice may require.

Dated: December 9, 2025

Respectfully submitted:


HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ERIC SELL
Counsel
Civil Rights Division

JEFFREY MORRISON
Acting Chief
Employment Litigation Section

HILARY PINION
Acting Principal Deputy Chief
Employment Litigation Section


*/s/ Brandon T. Wrobleski*
BRANDON T. WROBLESKI (VSB No. 89697)
Trial Attorney
Employment Litigation Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street, N.E., Suite 9.103
Washington, D.C. 20002
Phone: (202) 598-9122
Fax: (202) 514-1005
Email:  Brandon.Wrobleski@usdoj.gov