## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

United States of America,                    Court File No. 25-cv-04571 (PJS/DJF)

               Plaintiff,

v.

Board of Directors of Special School
District No. 1, Minneapolis Public Schools,
Special School District No. 1, Minneapolis
Public Schools, and Lisa Sayles-Adams,
Superintendent,

               Defendants.

_____

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS

_____

## <u>INTRODUCTION</u>

This case represents an unprecedented use of federal civil rights authority. The United States ("Plaintiff") asks this Court to invalidate collectively bargained agreements between Minneapolis Public Schools ("MPS") and the Minneapolis Federation of Educators ("MFE") based solely on theoretical concerns about contractual language—without alleging that discrimination ever occurred or is "the regular rather than the unusual practice." _Int'l Brotherhood of Teamsters v. United States_, 431 U.S. 324, 336 (1977). This facial challenge to labor agreements, divorced from any proof of systematic discriminatory conduct, fails to state a claim.

The Complaint suffers from three fatal deficiencies. First, it lacks Article III standing. The challenged Memorandum of Agreement with Black Men Teach expired months before this suit was filed, rendering those claims moot. More fundamentally, the Complaint alleges no discriminatory conduct whatsoever; no teacher excessed based on race, no examples of the provisions being applied, no statistical evidence of workforce imbalance. Federal courts require proof that future harm is "certainly impending," not "merely conjectural or hypothetical." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Theoretical applications of contract language cannot satisfy Article III.

Second, the Complaint fails to state a pattern-or-practice claim. Section 707 requires proof that discrimination is "the regular rather than the unusual practice"—the employer's "standard operating procedure." *Teamsters*, 431 U.S. at 336. But Plaintiff's own allegations demonstrate that seniority—not discrimination—governs teacher placement at MPS. The challenged provisions operate only as narrow exceptions to an overwhelmingly seniority-based system. As the Seventh Circuit held in *EEOC v. CVS Pharmacy, Inc.*, 809 F.3d 335, 340 (7th Cir. 2015), Section 707 does not authorize the federal government to challenge non-discriminatory employment practices based solely on contractual language it dislikes.

Third, the action cannot proceed without the MFE, an indispensable party that cannot be joined. The union negotiated the challenged provisions and possesses direct contractual rights under the agreements Plaintiff seeks to invalidate. Yet Section 707 claims against private employers must be brought by the EEOC, not the Attorney General, making joinder legally impossible.

These deficiencies are both manifold and fatal. This Court should reject Plaintiff's attempt to expand Section 707 beyond recognition and dismiss the Complaint with prejudice.

## FACTUAL BACKGROUND

### I.    PLAINTIFF'S COMPLAINT AND RELEVANT HISTORY OF THE CHALLENGED CONTRACT LANGUAGE.[1]

On December 9, 2025, Plaintiff filed this Section 707 action alleging violations of Title VII based solely on contract language between MPS and MFE. Complaint ("Compl."), ECF No. 2. The Complaint focuses on two primary areas: 1) Article 15 of the 2023–2025 CBA, which addresses teacher placement and excessing; and 2) the now-expired Memorandum of Agreement between MPS and MFE involving an outside organization (the "BMT MOA"). *Id.*

### A.    The Challenged Provisions of Article 15 of the CBA.

The 2023–2025 CBA referenced in the Complaint has been replaced by a ratified successor agreement. Declaration of Alicia Miller ("*Miller Decl.*"), ¶¶ 2-6, Exhibits 2-6. Article 15 of the CBA, titled "Transfer, Reassignment, and Recall," addresses staff reductions (including excesses and layoffs) and involuntary reassignments. Compl. ¶ 25;

---

[1]    The allegations in this section are taken from Plaintiff's Complaint and the documents incorporated by reference therein and are presumed to be true only for the purposes of Defendants' Rule 12(b)(6) motion. Defendants do not admit to any factual allegation or waive any argument or defense which may be asserted.  Defendants also do not admit to any legal conclusion asserted in the Complaint.

*Miller Decl.*, ¶ 2, Exhibit 1 ("2023–2025 CBA") at pp. 200-20.[2] Nothing in Article 15 explicitly refers to employees "of color" or otherwise directly references any employee's race, ethnicity, color, or national origin. *Id.*

The stated goal of Article 15 is "to facilitate the best match possible of teachers and sites or programs seeking teachers." Compl. ¶ 26; 2023–2025 CBA at p. 200 (§ 15.1.1). Article 15 states its diversity provisions are intended to remedy past discrimination and will sunset once teacher diversity reflects the relevant labor market. Compl. ¶¶ 27-28; 2023–2025 CBA § 15.1.2(i).

Article 15 addresses three primary employment actions: 1) excessing (involuntary reassignment), layoff, and recall/reinstatement. With respect to excessing, Article 15.2.5(b) establishes the general rule that when staff reductions occur at a building,

> all teachers shall be canvassed in seniority order within their specific licensure area/department to determine which teachers shall be excessed. The least senior teacher in the specific licensure areas/departments shall be excessed from the site/building if one or more senior teacher(s) decline the option of volunteering to be excessed.

Compl. ¶ 30-31; 2023–2025 CBA at pp. 201 (§ 15.2.5(b)). The further CBA provides:

> [I]f excessing a teacher who is a member of a population underrepresented among licensed teachers in the site, the District shall excess the next least senior teacher, who is not a member of an underrepresented population, for the reasons provided in Article 15.1.2.i.

*Id.*

---

[2]     Given that Plaintiff's claims involve the terms of CBA, it is appropriate for the Court to consider the actual language in the Agreement on a Rule 12 Motion to Dismiss. *See Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003*); see also Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n. 4 (8th Cir. 2003) ("[T]he contracts upon which [a] claim rests . . . are evidently embraced by the pleadings.")

Similarly, Article 15.9.2(d) addresses involuntary reassignment. Once again, seniority is the general rule, subject only to the limited operation of the temporary provisions of Article 15.1.2.i intended to remedy past discrimination. Compl. ¶¶ 34–36; 2023–2025 CBA at p. 209 (§ 15.9.2(d)).

Article 15.10.12 addresses limited and specifically delineated exemptions from District-wide layoff:

> Teachers working in the following schools and/or programs **may** be exempted from district-wide layoff outside of seniority order to ensure continuity of instruction to students at these sites based on the difficulty in filling vacancies at these sites with staff who are appropriately licensed, certified and bi-literate in the appropriate language.

Compl. ¶ 54; 2023–2025 CBA at p. 215 (§ 15.10.12) (emphasis added). These provisions permit—but do not mandate—exemptions from layoff.

With respect to reinstatement/call, seniority is once again the general rule. Compl. ¶¶ 44-46; 2023–2025 CBA at p. 214 (§15.10.7(d). This provision is also subject only to the limited operation of the temporary provisions of Article 15.1.2.i intended to remedy past discrimination. *Id.*

As demonstrated, notwithstanding the challenged provisions, Article 15 expressly and repeatedly establishes seniority as the dominant and default principle governing teacher placement throughout MPS.

## B.     The Expired BMT MOA.

The 2023–2025 CBA included the BMT MOA. Compl. ¶ 61; 2023–2025 CBA at p. 235. By its own language, the BMT MOA expired on June 30, 2025. *Id.* The BMT

MOA was not extended, renewed, or in any way continued beyond June 30, 2025. *Miller Decl.*, ¶¶ 3-6, Exhibits 2-4.

The Complaint alleges, "upon information and belief," that BMT Fellows interview for positions at a single school within MPS separately from all other external female and non-black applicants, and that Defendants offer BMT Fellows positions at this single school separately from any offers Defendants make to external female and non-black applicants. Compl. ¶¶ 67–68. Per the BMT MOA, "BMT Fellows" were exempted from all "contractual provisions for excessing and lay-off, to the extent allowable by law." Compl. ¶ 69; 2023–2025 CBA at p. 235. "BMT Fellows" were also permitted "five (5) days per year of reserve teacher coverage, with no loss of pay or benefits, to participate in BMT-sponsored professional development events." Compl. ¶ 70; 2023–2025 CBA at p. 235.

Nowhere does the Complaint allege that any teacher has been subjected to or exempted from excessing, layoff, or reinstatement pursuant to either the challenged provisions of Article 15 or the (now-expired) BMT MOA. The Complaint similarly lacks any allegation that Defendants took any employment action whatsoever pursuant to the (now-expired) expired BMT MOA.

## II.    PLAINTIFF'S CLAIMS

Plaintiff's Complaint asserts two claims, both arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Both claims are presented through the lens of Section 707(a), alleging that Defendants have engaged in a pattern or practice of discrimination based on race, color, national origin, and sex. Compl. ¶¶ 78–86.

## A.     Count I: Classification or Limitation Under Section 703(a)(2).

Count One alleges violations of Section 703(a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2), which provides:

> It shall be an unlawful employment practice for an employer . . . to limit, segregate, or classify his employees or applicants in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Compl. ¶ 78-82. Specifically, Plaintiff alleges that "since 2023 and until present day," Defendants have engaged in a pattern or practice of discrimination against MPS teachers by classifying or limiting their employees based on race, color, national origin, or sex under Article 15 of the CBA and the BMT MOA. *Compl.* ¶ 79-80.

Plaintiff asserts that the Attorney General has reasonable cause to believe that Defendants' "continued contractual obligations" to classify or limit employees based on race, color, national origin, and sex violate Section 703(a)(2) and constitute "a pattern or practice of resistance to the full enjoyment of" the rights of MPS teachers to equal employment opportunities without discrimination. *Compl.* ¶ 81 (citing Section 707(a) of Title VII, 42 U.S.C. § 2000e-6(a)).

## B.     Count II: Discrimination in Terms or Conditions Under Section 703(a)(1)

Count Two alleges violations of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1), which provides:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

*Compl.* ¶¶ 83-86. Plaintiff alleges that "since 2023 and until present day," Defendants have engaged in a pattern or practice of discrimination against MPS teachers by implementing preferences based on race, color, national origin, or sex, as required by the BMT MOA. Compl. ¶ 84.

Both counts invoke Section 707 of Title VII, which authorizes the Attorney General to bring civil actions when there is reasonable cause to believe that "any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by" Title VII. 42 U.S.C. § 2000e-6(a). Plaintiff alleges that the mere existence of the challenged provisions constitutes an actionable pattern or practice. Compl. ¶¶ 81, 85.

## APPLICABLE LEGAL STANDARDS

### A.     Rule 12(b)(1) — Subject Matter Jurisdiction.

Federal courts are courts of limited jurisdiction. *Gunn v. Minton*, 568 U.S. 251, 256 (2012). Article III requires a live case or controversy at all stages of litigation. *Brazil v. Arkansas Dep't of Human Servs.*, 892 F.3d 957, 959 (8th Cir. 2018). When issues are no longer live, the case is moot and must be dismissed for lack of jurisdiction. *Ali v. Cangemi*, 419 F.3d 722, 724 (8th Cir. 2005).

### B.     Rule 12(b)(6) — Failure to State a Claim.

In deciding a Rule 12(b)(6) motion, courts may consider the complaint as well as documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007); *Moses.com Sec., Inc. v. Comprehensive Software Sys.,* 406 F.3d 1052, 1063 n. 3 (8th Cir. 2005). "In a case involving a contract, the court

may examine the contract documents in deciding a motion to dismiss." *Stahl v. USDA*, 327 F.3d 697, 700 (8th Cir. 2003); *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n. 4 (8th Cir. 2003).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. Post-*Twombly* and *Iqbal*, "merely pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim." *Armstrong v. City of Minneapolis*, 525 F. Supp. 3d 954, 966–67 (D. Minn. 2021) (quoting *Kampschroer v. Anoka Cty.*, 57 F. Supp. 3d 1124, 1143 (D. Minn. 2014), *aff'd*, 840 F.3d 961 (8th Cir. 2016)).

### C.     Rule 19 — Indispensable Parties.

The Eighth Circuit follows the mandatory two-step Rule 19 framework, requiring courts to first determine whether a non-joined party is required under Rule 19(a)(1), and only then proceed to Rule 19(b) analysis if joinder is not feasible. *Sorenson v. Sorenson*, 64 F.4th 969, 975 (8th Cir. 2023). Under Rule 19(a), a party must be joined if complete relief cannot be accorded among existing parties, or if the absent party claims an interest relating to the subject matter and judgment may impair their ability to protect that interest or subject existing parties to inconsistent obligations. Fed. R. Civ. P. 19(a).

When a necessary party cannot be joined, courts must then apply Rule 19(b)'s four-factor test to determine whether to proceed or dismiss. Fed. R. Civ. P. 19(b). Those factors consider: (1) prejudice to absent or existing parties; (2) ability to lessen prejudice through protective provisions; (3) adequacy of judgment in person's absence; and (4) whether plaintiff would have adequate remedy if dismissed. *Id.*

## ARGUMENT

### I. This Court Lacks Subject Matter Jurisdiction Because the Complaint Fails to Establish Article III Standing.

#### A. Article III Requires Proof of Certainly Impending Harm for Injunctive and Pattern-or-Practice Relief.

Article III confines the jurisdiction of federal courts to "Cases" and "Controversies." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). This case-or-controversy requirement limits federal judicial power to actual disputes, not hypothetical ones. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–38 (2016). "As Justice Scalia memorably said, Article III requires a plaintiff to first answer a basic question: "'What's it to you?'" *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 882 (1983)).

The requirement that plaintiffs have a "personal stake" in the dispute "helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *Id.* (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 487 (1982). By

requiring plaintiffs to show an injury in fact, Article III standing "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action. For example, a citizen does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally." *Id.* at 381.

"[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). This requirement "subsists through all stages of federal judicial proceedings, trial and appellate." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). When "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," the case becomes moot and must be dismissed. *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam).

For forward-looking relief—including the pattern-or-practice injunctive relief sought here—the plaintiff must establish that future harm is "certainly impending," not "merely conjectural or hypothetical." *TransUnion*, 594 U.S. at 431 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). To satisfy Article III standing requirements, a plaintiff must demonstrate: (1) an injury in fact (2) caused by the challenged conduct of the defendant and (3) likely to be redressed by a favorable decision. *State v. EEOC*, 129 F.4th 452, 457 (8th Cir. 2025) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by

11

any continuing, present adverse effect." *TransUnion*, 594 U.S. at 431 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

This requirement applies with full force when the United States seeks injunctive relief. As a federal district court recently held in rejecting a Title VII consent decree, the government receives no special dispensation from Article III:

> That the United States is the plaintiff in this case does not change the analysis. Even when enforcing broad federal antitrust statutes against alleged monopolists, the United States has been required to show that a threatened violation of federal law is more than hypothetical.

*United States v. City of Tampa*, 739 F. Supp. 3d 1058, 1066 n.2 (M.D. Fla. 2024) (citing *Indus. Ass'n of S.F. v. U.S.*, 268 U.S. 64, 84 (1925)). This "applies with at least equal force . . . where the United States seeks injunctive relief against a local government, employing what is essentially a presumption of bad faith to transform stale bad acts under a different policy into a federal enforcement regime." *Id.*

## B.    The Complaint Fails to Allege Any Discriminatory Implementation Under Any of the Challenged Provisions.

The Complaint suffers from a fatal jurisdictional defect: it fails to allege any concrete injury or discriminatory act under any challenged provision. Nowhere does the Complaint allege that a single teacher was excessed, laid off, involuntarily reassigned, denied reinstatement, or otherwise subjected to adverse treatment under the challenged contract provisions. The Complaint contains no allegations that Defendants have ever implemented either Article 15's limited seniority exception provisions or the BMT MOA in any actual employment decision affecting any actual employee.

Instead, the Complaint only facially challenges the language of the CBA, seeking to enjoin contractual provisions not even alleged to have ever been applied. This falls well short of the "certainly impending" harm required for Article III standing.

In *United States v. City of Tampa*, the Middle District of Florida rejected a consent decree arising from a Section 707 claim based upon a less severe pleading deficiency. There, the United States brought a Title VII pattern-or-practice claim challenging a city's parental leave policy. 739 F. Supp. 3d at 1058–59. The complaint alleged specific instances of sex discrimination between February 2017 and December 2018, when the city "systematically applied its policy in a discriminatory manner, denying primary caregiver leave to male employees." *Id.* at 1059. In December 2018, the city adopted a revised policy. *Id.* at 1060. The United States filed suit in December 2023—five years after the City ceased the discriminatory practices alleged in the complaint. *Id.* at 1064–65. The same day the lawsuit was filed, the parties moved for entry of a consent judgment. *Id.* at 1058.

Despite alleging specific past instances of discrimination, the Middle District of Florida held the United States lacked standing for injunctive relief because the complaint contained no allegations of current or imminent future discrimination. *Id.* at 1064–65. The court explained that without evidence of ongoing discrimination, "the United States lacks standing to seek a comprehensive judicial reordering (complete with subsequent federal supervision) of a local government's personnel policies." *Id.* at 1063.

The court further found that the government's argument that the new policy might be misapplied because it shared structural similarities with the old policy amounted to

nothing more than "hypotheticals and conjecture about future unlawful conduct." *Id.* at 1065. Without allegations of current discriminatory implementation, the court held the United States was left with only "a 'highly speculative fear' that, absent federal supervision, Tampa will repeat the sins of the past." *Id.* at 1066 (quoting *Clapper*, 568 U.S. at 410). "But speculative fear cannot justify forward-looking relief." *Id.*

If the *Tampa* complaint—which at least alleged specific past instances of discrimination—failed to establish standing for prospective relief, the Complaint here must also fail. Unlike in *Tampa*, where the complaint alleged actual discriminatory conduct, here Plaintiff alleges no instances of discriminatory implementation whatsoever. Title VII does not permit Plaintiff to bootstrap theoretical applications of contract language into Article III standing without alleging the challenged language has been implemented in a systemic manner that resulted in discrimination. The mere possibility that Defendants might someday misapply narrowly tailored diversity provisions does not create the "certainly impending" harm required by Article III.

The Supreme Court has long recognized that Article III prohibits courts from giving advisory opinions to parties who merely allege governmental wrongdoing. *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Valley Forge*, 454 U.S. at 487). The Minnesota Supreme Court previously dismissed a taxpayer challenge to the challenge CBA language for lack of standing. *Clapp v. Sayles-Adams*, 15 N.W.3d 648 (Minn. 2025). Here, this court should similarly recognize that the Plaintiff has not established the elements of standing required under Article III.

C.      **The BMT MOA Claims Are Moot Because the Agreement is Expired
        and the Complaint Alleges No Ongoing Injury, Causation, or
        Redressability.**

Plaintiff's claims challenging the BMT MOA further lack Article III standing

because that agreement is expired. 2023-2025 CBA at p. 235. Nowhere does the

Complaint allege that the BMT MOA was extended beyond that date, renewed, replaced,

or that any provisions of the expired MOA remain in effect. The Complaint does not

allege that Defendants continue to apply the expired BMT MOA's terms, nor does it

allege that MPS intends to reinstate similar provisions. In fact, the record establishes that

the BMT MOA is expired and was not extended or otherwise included in the successor

CBA. *Miller Decl.*, ¶¶ 2-6, Exhibits 2-4.

The expiration of the BMT MOA is undisputed, unconditional, and complete. An

agreement that no longer exists cannot form the basis for prospective injunctive relief.

The Supreme Court has held that when challenged conduct ceases such that "there is no

reasonable expectation . . . that the alleged violation will recur," and "interim relief or

events have completely and irrevocably eradicated the effects of the alleged violation,"

the case becomes moot. *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979) (internal

citation omitted).

Here, the BMT MOA's expiration "completely and irrevocably eradicated" any

effects it may have given the fact that only prospective relief is sought. The BMT MOA

governed teacher recruitment and retention, at a single school, under limited

circumstances, and for a short period of time that expired on June 30, 2025. Any possible

employment decisions made under the BMT MOA occurred during that limited

timeframe and are now historical facts that cannot be undone through prospective injunctive relief.

More fundamentally, because the Complaint alleges no past injury resulting from actual implementation of the BMT MOA, Plaintiff cannot establish the "injury in fact" required for Article III standing. Without allegations of concrete harm to identifiable individuals, Plaintiff's challenge amounts to an abstract disagreement with expired contractual language—precisely the type of generalized grievance that Article III prohibits. *See Lujan*, 504 U.S. at 560–61. Plaintiff likewise cannot establish causation when it alleges no discriminatory conduct under the expired agreement, nor can it establish redressability when the agreement no longer exists to be enjoined.

Yet the Complaint seeks this Court to enjoin Defendants from "implementing the unlawful provisions of the BMT MOA." Compl. p. 19, Prayer for Relief ¶¶ (b)-(c). Such relief is impossible because Defendants cannot implement provisions of an agreement that no longer exists. Even if the Court were to issue such an injunction, it would redress no injury because there is no ongoing conduct to enjoin and no allegation of past harm to remedy.

This is the quintessential moot case presenting no justiciable Article III controversy. Federal courts do not issue advisory opinions, and an "actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). Plaintiff cannot manufacture jurisdiction by filing months after the challenged agreement expired without alleging any injury, causation, or redressability arising from that expired agreement.

16

## II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR WHICH RELIEF MAY BE GRANTED BECAUSE IT DOES NOT PLAUSIBLY ALLEGE ANY VIOLATION OF TITLE VII, LET ALONE A PATTERN AND PRACTICE OF SUCH VIOLATIONS.

The Complaint also fails to state plausible grounds for relief and must be dismissed pursuant to Rule 12(b)(6). A Section 707 pattern-or-practice complaint must allege systematic discriminatory *conduct* that violates the substantive provisions of Title VII, supported by specific factual allegations rendering the claims plausible. The Complaint here falls short of this well-settled standard.

### A.    The Complaint Fails to State a Pattern-or-Practice Claim Because It Alleges Only Contractual Language, Not Systematic Discriminatory Conduct.

This action is asserted pursuant to Section 707 of Title VII, which authorizes either the Attorney General or the U.S. Equal Employment Opportunity Commission (EEOC) to bring civil actions when there is "reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured *by this subchapter*, and that the pattern or practice is of such a nature and is intended to deny the full exercise *of the rights herein described*." 42 U.S.C. § 2000e-6 (emphasis added).

Section 707 is a procedural mechanism of limited scope for bringing Title VII claim and does not create any substantive rights or obligations in and of itself. Under the framework for Section 707 pattern-or-practice claims established by the Supreme Court in *Teamsters*, the government must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It had to establish by a preponderance of the

evidence that racial discrimination was the company's *standard operating procedure—the regular rather than the unusual practice*." 431 U.S. at 336 (emphasis added).

This standard requires proof that discrimination pervades the employer's decision-making processes. As the lead author of the Civil Rights Act of 1964, Minnesota Senator Hubert H. Humphrey, explained: "[A] pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but is *repeated, routine, or of a generalized nature*." *Id.* at 336 n.16 (citing 110 Cong.Rec. 14270 (1964)). Senator Humphrey continued: "The point is that single, insignificant, isolated acts of discrimination by a single business would not justify a finding of a pattern or practice." *Id.* (emphasis added). This legislative history not only informed the Court's decision in *Teamsters*, but it aptly highlights the deficiencies in Plaintiff's theory of the case here.

> 1.    *Section 707 Requires Allegations of Discriminatory Application, Not Mere Facial Challenges to Contractual Language.*

Section 707 does not authorize facial challenges to collective bargaining provisions absent plausible allegations of systematic discriminatory application. The distinction between facial challenges and as-applied challenges is fundamental: Plaintiff must allege not merely that contractual language *could* be applied discriminatorily, but that it *has been* applied in such a manner as to constitute the employer's "standard operating procedure." *Teamsters*, 431 U.S. at 336.

The Complaint here attacks what the CBA *says*, not what Defendants *have done*. This is a fatal deficiency under *Teamsters*. Federal courts have long recognized that

Section 707's "references to 'pattern-or-practice' . . . do not confer a particular right *per se*—rather they enable the government to enforce Title VII on behalf of groups of employees by alleging a 'regular procedure or policy' of unlawful employment discrimination under [sections 703 and 704]." *Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483, 488 (2nd Cir. 2013) (citing *Teamsters*, 431 U.S. at 343, 360) (emphasis in original)).

The 2015 decision of the Seventh Circuit in *EEOC v. CVS Pharmacy, Inc.*, 809 F.3d 335 (7th Cir. 2015), makes clear that pattern-or-practice authority requires factual allegations of actual discriminatory conduct against real people, not merely theoretical facial challenges to contractual language with which the government disagrees. At issue in *CVS Pharmacy* was an employer's practice of including a broad release of claims in severance agreements, including waiver of Title VII claims. 809 F.3d at 336-37. Upon learning of this practice, the EEOC demanded that the employer cease including the challenged language in future severance agreements and initiated a Section 707(a) pattern or practice action when the employer refused. *Id.* at 337-38.

The Seventh Circuit affirmed summary judgment to the employer, noting:

> Section 707(a) does not create a broad enforcement power for the EEOC to pursue non-discriminatory employment practices that it dislikes—it simply allows the EEOC to pursue multiple violations of Title VII (i.e., unlawful employment practices involving discrimination or retaliation defined in Sections 703 and 704) in one consolidated proceeding.

809 F.3d 335, 340-43 (7th Cir. 2015). The court held that the EEOC did not contend that the employer discriminated against any particular person by offering severance agreements containing the challenged provisions, nor did it assert any other violation of Title VII, such as retaliation. *Id.* In fact, the court noted that the EEOC could not

19

plausibly allege that the challenged contract language violated Title VII in the face of

binding precedent permitting employers to condition severance payments upon the

release of claims. *Id.* at 341 (citing *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 793 (7th Cir.

2005); *EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 452 (3rd Cir. 2015); *EEOC v. SunDance

Rehab Corp.*, 466 F.3d 490, 499 (6th Cir. 2006).

> 2.    *The Complaint Suffers the Same Fatal Deficiencies that Required
> Dismissal in* CVS Pharmacy.

If the EEOC cannot bring a pattern-or-practice claim without alleging actual

discrimination against identifiable individuals, as *CVS Pharmacy* holds, then neither can

the Department of Justice. To hold otherwise would create an arbitrary distinction

untethered to statutory text or purpose between Section 707 between claims brought by

the Department of Justice and the EEOC.

Like the complaint that was dismissed in *CVS Pharmacy*, the Complaint here is

devoid of any allegation that any employee of Defendants has been subjected to

discrimination under the challenged provisions. The Complaint identifies no teacher who

was excessed based on race rather than seniority. It alleges no statistical imbalance in

MPS' teaching workforce caused by the challenged provisions. It provides no concrete

examples of the provisions being applied in a discriminatory manner. It does not even

allege that challenged provisions have ever been invoked.

Instead, the Complaint attacks the contractual language itself, baldly alleging that

the provisions "permit" racial considerations in employment decisions. Compl. ¶¶ 56-60.

These are precisely the type of blanket legal assertions that *CVS Pharmacy* found

insufficient to state a pattern-or-practice claim. Like the EEOC in *CVS Pharmacy*, Plaintiff takes issue with what the agreement *says*, not what the Defendants have *done*. This is a facial challenge to language the Plaintiff merely dislikes dressed up as a pattern-or-practice claim, which Section 707 does not authorize.

> 3.    *The Complaint Seniority Systems Dominate the CBA, Precluding Any Finding That Discrimination Is the "Standard Operating Procedure."*

The Complaint's own allegations demonstrate that seniority—not discrimination— is the "standard operating procedure" governing the challenged employment practices of MPS. Compl. ¶ 32 ("The 2023–25 CBA *generally obligates* Defendants to conduct staff reductions through 'excessing' based on seniority classification"), ¶ 35 ("Article 15 *generally obligates* Defendants to conduct involuntary teacher reassignments based on seniority classification"), ¶ 45 ("Article 15 *generally obligates* Defendants to reinstate laid-off teachers 'in the inverse order of placement on layoff.'"), ¶ 55 ("Article 15 *generally obligates* Defendants to follow certain non-racial preferences when determining the order of layoffs.") (emphasis added). The seniority provisions contained in the CBA, consistently described in the Complaint as Defendants' "general policy," apply neutrally. They operate facially without regard to race, national origin, or sex, treating all teachers identically based solely on length of service. The provisions create no unlawful classifications, impose no unlawful preferences, and make no distinctions based on protected characteristics.

Plaintiff challenges limited *exceptions* to this seniority-dominated system. But limited exceptions to a general rule cannot establish that discrimination is "the regular

rather than the unusual practice." By definition, an exception is unusual—it necessarily represents departure from standard procedure, not standard procedure itself.

###### 4.    *Exception Provisions Cannot Establish Systematic Discrimination.*

Even if the Complaint alleged that these exception provisions were applied regularly—recall that Plaintiff does not even allege that they have been applied at all—their narrow scope and limited impact would not support a plausible allegation of the required systematic discrimination to justify invocation of Section 707.

*Teamsters* distinguished between isolated acts of discrimination and systematic discriminatory practices: "A 'pattern or practice' would be present only where the denial of rights . . . is repeated, routine, or of a generalized nature." 431 U.S. at 336 n.16. The Supreme Court emphasized that "single, insignificant, isolated acts of discrimination by a single business would not justify a finding of a pattern or practice." *Id.* Exception provisions that apply only in narrow circumstances simply are not "repeated, routine, or of a generalized nature." Their application depends on multiple contingencies, limiting their operation to exceptional situations.

Moreover, Plaintiff has not alleged any facts showing the exceptions have been applied at all, let alone frequently enough to constitute systematic discrimination. Absent such factual allegations, the Court cannot infer that the exception provisions operated systematically rather than sporadically.

Courts reject pattern-or-practice claims where alleged discrimination affects only a small number of individuals. *See Cooper  v. Fed. Res. Bank of Richmond*, 467 U.S. 867, 875-6 (1984) ("if one allegation of specific discriminatory treatment were sufficient to

support an across-the-board attack, every Title VII case would be a potential companywide class action") (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 159 (1982)); *U.S. v. State of N.C.*, 914 F.Supp. 1257, 1273 (E.D. N.C. 1996) (thirty-seven instances over eight to ten years across ninety prisons insufficient); *Reyes v. Missouri-Kansas-Texas R. Co.*, 53 F.R.D. 293, 296 (E.D. Tex. 1971) ("Title VII is a remedial statute designed to eliminate widespread discrimination, not to redress isolated grievances affecting limited numbers of employees."); *see also U.S. v. Fitness Int'l LLC*, 2025 WL 2093424 at *5 (C.D. Cal., June 6, 2025) (four individuals across 700 locations nationwide insufficient for ADA pattern or practice claim).

Similarly, here, exception provisions affecting a subset of excessing decisions—themselves a fraction of total employment decisions—cannot establish the systematic discrimination required for Section 707 liability.

5.      *"Upon Information and Belief" Cannot Substitute for Plausible Factual Allegations of Discriminatory Conduct.*

The Complaint's reliance on "upon information and belief" allegations highlights its factual deficiency. Federal courts require that allegations based on information and belief be supported by sufficient factual matter to render claims plausible. *Armstrong*, 525 F. Supp.3d at 966–67.

Plaintiff even speculates "upon information and belief" about the very definitions of terms lying at the heart of its theory of the case, yet provides no factual basis supporting its speculation. *See* Compl. ¶¶ 20-21. Even more problematically, Plaintiff extrapolates upon its mere "information and belief" to allege the critical element—

discriminatory intent. *See* Compl. ¶¶ 23-24 (alleging the seniority exception provisions "serve Defendants' goals for increasing the number of 'BIPOC' teachers and staff."). This conclusory allegation fails to identify what information Plaintiff possesses or what the basis for its belief is. Under *Iqbal/Twombly*, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Upon information and belief" allegations unsupported by factual content are precisely the type of conclusory pleading the Supreme Court disfavors.

**B.    Even If Facial Challenges Were Permissible Under Section 707, the Challenged CBA Provisions Are Facially Lawful Under Binding Precedent.**

The Complaint's facial attack on the CBA provisions also fails to state a claim because the challenged language, on its face, falls within the safe harbor established by binding Supreme Court precedent for voluntary affirmative action programs. Courts in the Eighth Circuit recognize that a complaint fails to state a claim under Rule 12(b)(6) where, even accepting all factual allegations as true, the defendant's conduct is legally permissible. *See Kimberly v. Crop Risk Serv., Inc.*, 572 F.Supp.3d 677, 685 (S.D. Iowa 2021) (noting complaints may be dismissed for failure to state a claim because of legal insufficiency rather than factual insufficiency) (citing *Brown v. Mortgage Electronic Registration Sys., Inc.*, 738 F.3d 926, 933 n.7, 934 (8th Cir. 2013)). Here, the challenged CBA provisions are permissible under *United Steelworkers of Am. v. Weber*, 443 U.S. 193 (1979), and *Johnson v. Transp. Agency, Santa Clara Cnty.*, 480 U.S. 616 (1987).

      1.     *Weber* and Johnson *Establish That Title VII Permits Voluntary Affirmative Action.*

In *Weber* and *Johnson*, the Supreme Court held that that Title VII permits voluntary affirmative action plans designed to remedy manifest imbalances when they: (1) have remedial purposes; (2) don't unnecessarily trammel non-minority interests or create absolute bars; (3) are temporary; and (4) don't require discharge of non-minority workers. *Weber*, 443 U.S. at 208-09 ("We therefore hold that Title VII's prohibition . . . against racial discrimination does not condemn all private, voluntary, race-conscious affirmative action plans."); *Johnson*, 480 U.S. at 632. *Weber* and *Johnson* remain binding precedents.

While Plaintiff may cite *Bostock v. Clayton County*, 590 U.S. 644 (2020), for the proposition that Title VII's text admits no exceptions, *Bostock* did not overrule either *Weber* or *Johnson*—indeed, it did not mention them. *Bostock* addressed whether discrimination "because of sex" encompasses discrimination based on sexual orientation and transgender status; it said nothing about voluntary affirmative action. Similarly, while Plaintiff may invoke *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023), that decision addressed Equal Protection challenges to race-conscious admissions in higher education under strict scrutiny—an entirely different constitutional framework than Title VII employment discrimination. Neither *Bostock* nor *SFFA* even mentioned *Weber* or *Johnson*, much less overruled them.[3]

---

[3]     Also noteworthy is the fact that the claims in *Bostock* and *SFFA* were brought by plaintiffs claiming actual application of challenged practices.

When the Supreme Court wishes to overrule precedent, it does so explicitly. Unless and until *Weber* and *Johnson* are overruled, they control.

> 2.     *The Complaint Fails to Allege That the CBA Provisions Facially Violate* Weber/Johnson*.*

To state a facial challenge to the CBA provisions, the Complaint must allege facts showing they exceed the boundaries of permissible affirmative action on their face. The Complaint fails to meet this standard.

> a.     Remedial Purpose.

The CBA expressly states its diversity-related provisions are intended "to remedy the continuing effects of past discrimination by the District . . . [that] disproportionately impacted the hiring of underrepresented teachers in the District, as compared to the relevant labor market and the community, and resulted in a lack of diversity of teachers." Compl. ¶ 27 (quoting 2023-2025 CBA at p. 200 (§ 15.1.2(i))). The Complaint acknowledges this remedial purpose but dismisses it with the bare assertion that it is "not supported by any analytical process or factual basis." Compl. ¶ 29. This conclusory allegation is insufficient under *Iqbal* to overcome the CBA's express statement of remedial purpose addressing—the precise justification *Johnson* recognized as sufficient. 480 U.S. at 632.

> b.     No Unnecessary Trammeling.

The Complaint does not—and cannot—allege that the challenged CBA provisions create an absolute bar to employment or advancement of non-minority teachers. The CBA retains seniority as the general principle for excessing and reassignment, providing only

narrow exceptions in limited circumstances. This does not create an absolute bar; it merely adjusts the order of excessing to protect against disproportionate impact on underrepresented teachers under limited circumstances. In *Weber*, the Court upheld a plan requiring that 50% of training program openings be reserved for Black employees—a far more substantial preference than the seniority adjustment here. 443 U.S. at 197–98. The challenged provisions in the CBA are materially less burdensome than the quota upheld in *Weber*.

    c.  Temporary Nature.

   The CBA expressly provides that its diversity-related provisions "will no longer be in effect once the teachers in the District reflect the diversity of the labor market and the community served by the District." Compl. ¶ 28 (quoting 2023-2025 CBA at p.200 (§ 15.1.2(i))). This is a textbook temporary measure with a defined and self-executing endpoint tied to elimination of imbalance, precisely what *Weber* requires. 443 U.S. at 208.

    3.  *Portraying Facially Lawful Conduct as a "Pattern or Practice" Does Not Make It Unlawful.*

   Section 707 authorizes the Attorney General to bring suit when there is a "pattern or practice of resistance to the full enjoyment of any of the rights secured by [Title VII]." 42 U.S.C. § 2000e-6(a). But Title VII secures only the right to be free from *unlawful* discrimination. If the challenged conduct falls within *Weber/Johnson*'s safe harbor for permissible affirmative action, it does not violate Title VII and therefore cannot constitute a "pattern or practice" of unlawful discrimination.

The Complaint's theory would render *Weber* and *Johnson* meaningless. Under Plaintiff's logic, any employer that adopts a voluntary affirmative action plan is engaged in a "pattern or practice" of unlawful discrimination, even if such a plan is never implemented or acted upon. But *Weber* and *Johnson* expressly contemplated that employers would adopt and implement such plans. The Supreme Court would not have authorized voluntary affirmative action if merely adopting such plans automatically subjected employers to Section 707 liability.

## III.   THE MINNEAPOLIS FEDERATION OF TEACHERS IS AN INDISPENSABLE PARTY UNDER RULE 19.

Plaintiff's failure to join MFE as a party requires dismissal under Rule 19. MFE is a signatory to the challenged CBA and possesses direct interests that would be fundamentally impaired by this litigation.

### A.     MFE Is a Required Party Under Rule 19(a).

Rule 19(a) requires joinder of parties who "claim[] an interest relating to the subject of the action and [are] so situated that disposing of the action in the [party's] absence may . . . as a practical matter impair or impede the [party's] ability to protect that interest." Fed. R. Civ. P. 19(a)(1)(B)(i). MFE satisfies this standard.

The union is a signatory to both the CBA and the BMT MOA. MFE had direct involvement in the negotiation of both of the provisions DOJ challenges, and has direct contractual rights under these agreements. DOJ seeks to enjoin implementation of CBA provisions that MFE negotiated to protect its members' interests. The requested relief would prohibit the application contractual provisions that MFE obtained through

28

collective bargaining with MPS. This directly impairs MFE's ability to represent its members' interests with respect to negotiated terms and conditions of employment.

Further, if the Court grants Plaintiff's requested relief, MPS would face conflicting legal obligations. MFE could file a grievance demanding MPS comply with the CBA. MFE could file an unfair labor practice charge against MPS for unilaterally altering or failing to honor negotiated terms. These competing obligations create precisely the risk Rule 19 is designed to prevent. This Hobson's choice demonstrates that complete relief cannot be accorded without joining MFE.

In *National Organization for Women v. Minnesota Mining & Manufacturing Co.*, the District of Minnesota addressed the framework for when unions are necessary parties in Title VII cases involving collective bargaining agreements. *See Nat. Org, for Women, Inc. v. Minn. Min. & Mfg. Co.*, 73 F.R.D. 467 (1977). The court found joinder was required because "some of the allegedly discriminatory practices of which plaintiffs complain may be embodied in provisions of the collective bargaining agreements which were negotiated by and between 3M and the two unions." *Id.* at 469. The court emphasized that unions may face liability since "[t]o the extent that the job classification and seniority systems and other policies embodied in the collective bargaining agreements are responsible for any sexually discriminatory practices, the unions may be liable for past discrimination." *Id.* at 470. Additionally, the court noted the risk that "the company's obligations under the collective bargaining agreements with the unions might be substantially inconsistent with the obligations imposed upon it by the court." *Id.*

Moreover, federal and state labor law gives MFE exclusive representative status for Minneapolis teachers. 29 U.S.C. § 159(a); Minn. Stat. § 179A.03, subd. 8. As the exclusive bargaining representative, MFE has a legally protected interest in the integrity of negotiated agreements. Plaintiff's attempt to invalidate CBA provisions without joining the union violates MFE's representational rights. For these reasons, MFE is a required party.

**B.    Joinder of MFE is Not Feasible as a Matter of Law.**

Rule 19(a) requires the joinder of indispensable parties when feasible. If joinder of a required party is not feasible, then the court "must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." In this case, the joinder of MFE as a party to this Section 707 action is not feasible.

As originally enacted, Title VII granted the Attorney General exclusive authority to bring pattern or practice suits under Section 707. *See Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 327-9 (1980); *United States v. Fresno Unified Sch. Dist.*, 592 F.2d 1088, 1090-5 (9th Cir. 1979) (discussing the legislative history of Section 707); *see also CVS Pharmacy, Inc.*, 809 F.3d at 339-41 (same). While the 1972 amendments to Title VII provided that "the functions of the Attorney General under [Section 707] shall be transferred to the [EEOC]," the subsequent Reorganization Plan No. 1 of 1978 restored the Attorney General's authority specifically for public sector pattern or practice litigation while leaving the EEOC with jurisdiction over private parties. *Fresno Un. Sch. Dist.*, 592 F.2d at 1091.

30

This public/private distinction is significant. As MFE is not a public employer, and Section 707 claim against the union must be brought by the EEOC and not by the Attorney General. Further, any Section 707 action brought by the EEOC would then be subject to the pre-suit requirements of Section 706 of Title VII. 42 U.S.C. § 2000e-6(e). Those requirements include the filing of a charge, an investigation, a reasonable cause finding, and an attempt to conciliate the dispute. 42 U.S.C. § 2000e-5. The EEOC is not a party to this action and the pre-suit requirements under Section 706 have not occurred with respect to MFE.  MFE thus cannot be feasibly joined as a party as a matter of law.

### C.    The Action Cannot Proceed Without MFE.

As MFE cannot be joined, Rule 19(b) requires the court to consider four factors to determine whether this action should proceed or be dismissed: (1) prejudice to absent or existing parties; (2) ability to lessen prejudice through protective provisions; (3) adequacy of judgment in person's absence; and (4) whether plaintiff would have adequate remedy if dismissed. Fed. R. Civ. P. 19(b). These factors support dismissal.

First, MFE has a critical interest in defending provisions it negotiated. Allowing Plaintiff to seek an order invalidating those provisions without the MFE's participation fundamentally violates due process. Second, the litigation can be structured to protect MFE's interests only by joining the union as a defendant. No other protective measures would suffice. Third, a judgment rendered in MFE's absence would not be adequate. The union could collaterally attack any judgment, arguing it is not bound by litigation in which it did not participate. Fourth, Plaintiff has an adequate remedy if the case is dismissed: it can follow the appropriate pre-suit requirements of Section 706 of Title VII.

Further, any individual claiming to have suffered a legally actionable injury because of the challenged contract language has adequate remedies through traditional procedures. They could file a grievance under the terms of the CBA or file a charge of discrimination with the EEOC and/or the Minnesota Department of Human Rights. Section 707 has historically been invoked in situations involving numerous individual victims of unlawful discrimination and where it is more economical to address an employer's challenged conduct as a pattern or practice rather than through multiple individual claims. The utter absence of any such individual claimants speaks volumes and fatally undercuts any claim of the existence of an unlawful as a pattern or practice.

## CONCLUSION

Plaintiff asks this Court to do what no court has done before: invalidate collective bargaining provisions under Section 707 of Title VII based purely on what they say, not what Defendants have done. The Complaint alleges no discrimination against any employee or applicant for employment. It challenges an agreement that has expired. It attacks narrow exceptions to a seniority-dominated system as if they were the rule itself. And it proceeds without joining the union that negotiated the very provisions the government seeks to invalidate.

This is not a Case or Controversy. It is a request for an advisory opinion dressed up as civil rights enforcement. Article III prohibits federal courts from issuing such opinions. Even if Article III jurisdiction existed, Section 707 does not authorize facial challenges to contract language absent systematic discriminatory conduct. Finally, Rule

19 does not permit litigation that would bind absent parties with direct contractual interests at stake.

The Complaint fails to meet minimal pleading standards at every turn. For the reasons set forth herein, this Court should dismiss the Complaint with prejudice.

Respectfully submitted,

**RATWIK, ROSZAK & MALONEY, P.A**.

Dated: February 9, 2026          By: *s/ Timothy A. Sullivan*
                                        Timothy A. Sullivan (#391526)
                                        Ratwik, Roszak, & Maloney, P.A.
                                        444 Cedar St., Suite 2100
                                        Saint Paul, MN 55101
                                        (612) 339-0060
                                        tas@ratwiklaw.com

**ATTORNEYS FOR DEFENDANTS**

RRM:      597431