## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,
                Plaintiff,

v.

BOARD OF DIRECTORS OF SPECIAL
SCHOOL DISTRICT NO. 1,
MINNEAPOLIS PUBLIC SCHOOLS;

SCHOOL DISTRICT NO. 1,
MINNEAPOLIS PUBLIC SCHOOLS;

and,

LISA SAYLES-ADAMS,
SUPERINTENDENT,

                Defendants.

Case No. 0:25-cv-04571 (PJS/DJF)

### PLAINTIFF UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

Defendants Board of Directors of Special School District No. 1, Minneapolis Public Schools; Special School District No. 1, the Minneapolis Public Schools (MPS); and Minneapolis Public Schools Superintendent Lisa Sayles-Adams (collectively, Defendants) have an explicit written policy dictating teacher reassignments, excessing, and reinstatements based on the teacher's race.[1] Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (Title VII) has prohibited such policies since its enactment in 1964, and it is the Attorney General's statutory right to root out and eliminate

---

[1] References herein to "race" encompass race, color, and national origin.

such discrimination. After attempts to resolve this matter without litigation failed, Plaintiff United States of America (Plaintiff or United States) had no choice but to bring suit to enjoin this unlawful conduct.

Defendants now claim this is an "unprecedented use of federal civil rights authority" because the United States does not identify a specific victim harmed by these racially discriminatory policies. But under the plain text of the statute, Defendants' discriminatory policies here—memorialized in their collective bargaining agreement (CBA) with the local teachers' union—violate Title VII.

And Defendants' discriminatory conduct does not stop there. MPS also had, until recently, a program that provides certain incentives and benefits to teachers based on their race and sex. The "Black Men Teach" program too is explicit and blatant race discrimination, as well as sex discrimination, that Title VII has always prohibited. MPS did not renew the program, but only after the United States opened the investigation that led to this case and notified MPS of its illegality. Absent the narrow relief the United States seeks, it would be all too easy for Defendants to reinstate this discriminatory and unlawful program at any point down the road.

Defendants' arguments that the Court lacks subject matter jurisdiction and that the Complaint fails to state a claim boil down to the same fundamental misunderstanding of how Title VII enforcement by the Attorney General works. Moreover, Defendants' argument that the teachers' union must be joined to this case fundamentally misunderstands the requirements for Rule 19 joinder.

*First*, Defendants argue the Complaint fails to state a claim because the United

States does not identify a specific victim, and therefore no individual has been injured by the provisions at issue. But that is not true. Title VII makes it illegal not only to discriminate against employees based on protected characteristics but also to "classify" and "limit" them based on protected characteristics in a way that would adversely affect their employment status. That is what the provisions at issue do, and the United States sufficiently alleges as much to state a plausible claim.

As a last resort, Defendants invoke *United Steelworkers of America v. Weber*, 443 U.S. 193 (1979), and *Johnson v. Transportation Agency, Santa Clara County, California*, 480 U.S. 616 (1987), to justify discriminating against its employees. But these cases were built on a foundation of sand the day they were decided—a foundation that has completely eroded in light of recent Supreme Court precedent. Title VII's text clearly prohibits employers from discriminating against their employees based on protected characteristics. And invoking the "spirit" of the law to justify blatant race and sex discrimination—which *Weber* and *Johnson* did—can no longer stand. But even if they were still good law, the policy at issue here does not satisfy the narrow exception to Title VII that these cases created.

*Second*, Defendants similarly argue the Court lacks subject matter jurisdiction because of the lack of a specifically identified victim. But Defendants urge the Court to force a square peg into a round hole, incorrectly relying on the Article III requirements for claims brought by *private plaintiffs* rather than enforcement actions brought *by the United States*. The Attorney General determined there was reasonable cause to believe that the very existence of the policies violates federal law. That determination is all the United

States needs to establish a case or controversy under its statutory authority to enforce Title VII.

And the mere fact that MPS discontinued the discriminatory Black Men Teach program once it got caught by the United States does not deprive the Court of jurisdiction to enjoin Defendants from implementing the program in the future. The program was in effect at the time the United States sent its notice of investigation to MPS. And Defendants have yet to provide the requisite commitments to this Court—that it has disavowed the legality of the program and will not implement it again in the future—to moot the claim. This is a classic case of voluntary cessation.

*Finally*, Defendants are wrong that the teachers' union, the Minneapolis Federation of Educators, Local 59 (the Union), is an indispensable party such that the case must be dismissed if it cannot be joined. The CBA at issue contains a severability clause that explicitly envisions that the challenged provisions would be unenforceable in a breach of contract action if a federal court deems them unlawful. The Union's joinder is not required because full relief—declaring the challenged provisions illegal and enjoining enforcement of the severable illegal provisions—can be afforded without its involvement. Moreover, injunctive relief will not prejudice the Union's rights because it has no right to include illegal provisions in its CBAs with MPS.

Even if the Court finds that the Union is a required party, joinder is still feasible. The Union may be joined as a party for the limited purposes of effectuating complete relief and protecting its interests. And if this Court were to find that joinder is infeasible, this case may continue without the Union for the same reasons the Union is not a required party.

4

On the other hand, dismissal would severely prejudice the United States as an enforcer of civil rights law. If the case is dismissed, the Attorney General would not be able to enforce Title VII's prohibition of unlawful racial classifications and limitations in employment practices against a public school district unless the enforcement action is a joint effort with the Equal Employment Opportunity Commission (EEOC), which has the authority to enforce Title VII against unions.[2] This is an absurd result that would create a loophole for any public employer to embed discriminatory provisions in a CBA with a union to avoid liability.

Defendants are discriminating against their employees based on their race and sex. While Defendants may be engaged in discrimination for what they believe to be a benevolent reason, its conduct violates Title VII nonetheless. And it is the Attorney General's statutory right to eliminate such discrimination when she finds it. This enforcement action is the only option to end discrimination in MPS, and as such, the Court should deny Defendants' motion to dismiss.

---

[2] The EEOC has jurisdiction to bring Title VII enforcement actions against labor organizations such as the Union. 42 U.S.C. § 2000e-5(f)(1).

## FACTUAL BACKGROUND

The United States seeks to enjoin Defendants from violating Title VII by classifying, limiting, and discriminating against their teachers based on their race, color, sex, and national origin by maintaining Article 15 and the Black Men Teach Memorandum of Agreement (Black Men Teach MOA) in their CBA with the Union in apparent service of their goal to hire more "black, indigenous, and people of color (BIPOC)" teachers. Compl., ECF No. 2 at ¶¶ 21-22. Defendants' CBA with the Union affirms at the outset that Defendants intend to "support[] educators, specifically educators of color, in navigating and disrupting our District as a predominantly white institution." *Id.* at ¶ 14. This includes "establishing initiatives for recruitment, retention, and development of educators of color," a reference to teachers' race, color, or national origin. *Id.* at ¶ 17.

Within the CBA, Defendants label teachers according to their status as "educators of color," which is a reference to a teacher's race, color, or national origin. *Id.* at ¶ 18. Defendants also label teachers within the CBA according to their membership in "underrepresented populations," which is a proxy for a teacher's race, color, or national origin. *Id.* at ¶ 19. Teachers from "underrepresented populations" and "educators of color" are putatively the subject of Defendants' stated goals to hire more "BIPOC" (black, indigenous, and people of color) staff and teachers. *Id.* at ¶¶ 20-21. Defendants announced in a separate 2023-26 plan that they would "increase [their] BIPOC staffing" from 37.6% in 2023 to "at least 40% by 2026." *Id.* at ¶ 22. And in a 2025 strategic plan, Defendants further advertised that by 2026-27, "54.3% of new [teacher] hires [will] identify as Black, Indigenous, and People of Color (BIPOC)." *Id.*

The first provision at issue in this lawsuit, CBA Article 15, requires Defendants to subvert their normal seniority-based processes and exempt teachers from employment actions like "excessing" and involuntary reassignment, and prioritize them for reinstatement, if they are members of an "underrepresented" population—a proxy for race, color, and national origin. *Id.* at ¶¶ 19, 31-53. And the second provision at issue here, the Black Men Teach MOA, requires Defendants to exempt black male fellows from the usual seniority-based processes for excessing and layoffs, and to provide these black male teachers with extra paid teacher reserve coverage days—benefits which female and non-black teachers cannot receive. *Id.* at ¶¶ 67-71.

The United States notified Defendants of its Title VII investigation and thereafter of its finding that Defendants were violating the law. *Id.* at ¶¶ 82, 86; Jones Decl., Exh. 1-2. Only afterward did Defendants ratify a "Tentative Agreement" regarding their 2025-2027 CBA, which, although it does not contain a renewal of the Black Men Teach MOA, leaves the challenged Article 15 provisions intact; Defendants admit that they are still "reviewing and drafting" and that the successor CBA "has not been finalized." Miller Decl., ECF No. 11, ¶¶ 3-6; *see also* Miller Decl., Exh. 1, 2023-2025 CBA, ECF No. 11-1, ¶ 1.3.1 (2023-2025 CBA remains in effect until a new CBA takes effect).

The United States contends that by maintaining these mandatory CBA provisions, Defendants are engaged in a pattern or practice of resistance to the rights secured by Section 703 of Title VII.

Defendants now ask the Court to dismiss the case with prejudice under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, Rule 12(b)(6) for failure

to state a claim, and Rule 12(b)(7) for failure to join an indispensable party. *See* Defs.' Mot. to Dismiss (Mot.), ECF No. 8; Defs.' Memo. in Supp. of Mot. to Dismiss (Memo), ECF No. 10. Their arguments lack merit, and the motion to dismiss should be denied for the following reasons.

## **ARGUMENT**

**I.    The United States Has Plausibly Alleged Defendants Are Engaged in a Pattern or Practice of Resistance to the Rights Secured by Title VII.**[3]

### **A.    Rule 12(b)(6) Standard**

To survive a 12(b)(6) motion to dismiss, a plaintiff must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," and allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-59 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In analyzing whether the complaint sufficiently states a claim, the Court should accept as true the factual allegations and construe the complaint in the light most favorable to the plaintiff, drawing all inferences in the plaintiff's favor. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

---

[3] The United States first addresses Defendants' argument that it fails to state a claim. Defendants' initial contention is that subject matter jurisdiction is lacking because no identified individual has allegedly been harmed by the provisions at issue—an incorrect assertion based on the false assumption that such harm is necessary for a claim under Section 707. The United States first explains why its allegations are sufficient to allege claims under Section 707, clearly showing there is an active case or controversy.

**B.**    **The United States has sufficiently alleged claims against Defendants.**

    **1.**    **The plain text of Section 703 prohibits limiting or classifying employees in a way that would adversely affect their status as employees on the basis of a protected characteristic.**

The United States need not allege that a specific individual has been harmed by Article 15 or the Black Men Teach MOA to establish an unlawful pattern or practice under Section 707. Defendants claim that the Complaint "attacks what the CBA *says*, not what Defendants *have done*" in that the United States did not allege Defendants applied the contested CBA provisions to individuals. Memo 18. This alleged defect, their argument goes, "is a fatal deficiency" under *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). Memo 18.

Yet this is not a case focused on "discriminatory acts" and whether "the Government ultimately had to prove more than . . . mere occurrence of isolated or 'accidental' or sporadic" acts to prove they were a "pattern or practice." *Teamsters*, 431 U.S. at 336. In *Teamsters*, "[t]he Government's theory of discrimination was simply that the company . . . regularly and purposefully treated Negroes and Spanish-surnamed Americans less favorably than white persons." *Id.* at 335. The "central claim" was that black and "Spanish-surnamed" employees "were given lower paying, less desirable jobs as servicemen or local city drivers, and were thereafter discriminated against with respect to promotions and transfers." *Id.* at 329. The case involved "statistical evidence" along with "the testimony of individuals." *Id.* at 338. The focus was discriminatory acts rather than formal, written policies.

But here, the Complaint's focus is on classifications and limitations of employees

based on protected status under Section 703(a)(2), just as much outlawed by Title VII as discriminatory acts. *See* 42 U.S.C. 2000e-2(a)(1)-(2) (making it "unlawful" not only to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate" based on protected status but also "to limit, segregate, or classify" employees based on protected status). Count 1 of the Complaint is explicitly aimed at "limitation and classification" under Section 703(a)(2) while Count 2, alleging discrimination under Section 703(a)(1), applies only to the Black Men Teach MOA. Compl. at 16. And the allegations in the Complaint readily meet the text of Section 703(a)(2). The Complaint alleges that Article 15 classifies teachers as "underrepresented" based on race, color, or national origin (Compl. ¶¶ 19-21), then limits non-underrepresented teachers' opportunities by excessing them first (¶¶ 33, 37-43), reassigning them involuntarily first (¶¶ 36-43), permitting laying them off first (¶¶ 57-60), and prioritizing underrepresented teachers in reinstatements before them (¶¶ 46-53). And the Black Men Teach MOA added additional race-based preferences as well as sex-based preferences for black male fellows (¶¶ 68-77).

As the Complaint alleges, the relevant CBA provisions explicitly classify and limit teachers based on race, color, national origin, and sex in a way that "*would* deprive or tend to deprive" non-underrepresented teachers of opportunities or otherwise adversely affect their status as employees, violating Section 703(a)(2), 42 U.S.C. § 2000e-2(a)(2) (emphasis added). The statutory text does not say "deprives" or "adversely affects" in an active sense, but "would deprive or tend to deprive . . . or otherwise adversely affect"—the conditional tense. Congress chose language that encompasses discriminatory classifications and limitations that "would" cause harm, not just consummated adverse actions. *See EEOC v.*

10

*AutoZone, Inc.*, 860 F.3d 564, 569 (7th Cir. 2017) (noting that Section 703(a)(2) also governs actions having "only a *tendency* to deprive a person of employment opportunities," thereby "cast[ing] a wider net than subsection (a)(1), which speaks more concretely in terms of actions that 'discriminate against any individual.'"). Thus, the classifications and limitations at issue are themselves violations of the text of the statute, even absent specific instances of discrimination against identified individuals. And at no point in their Motion to Dismiss do Defendants contest that the Article 15 provisions or the Black Men Teach MOA "classify" and "limit," nor do they identify binding precedent foreclosing the plain text interpretation that classifications and limitations are themselves violations. Thus, the case should proceed. On top of that, this case proceeds under Section 707, which prohibits a pattern or practice of "resistance" to the full enjoyment of rights under Title VII. *See* 42 U.S.C. § 2000e-6(a). The racial classifications and limitations at issue cause "resistance" to the full enjoyment of those rights even if they do not result in adverse action toward a specific person. *See EEOC v. Doherty Enters.*, 126 F. Supp. 3d 1305, 1311 (S. D. Fla. 2015) (a "resistance" claim is not limited to cases involving "discrimination and retaliation").

Though most pattern or practice cases address discriminatory acts, cases across multiple jurisdictions confirm this plain-text interpretation by similarly finding that discriminatory formal policies, including contract provisions, themselves violate Title VII. *See, e.g.*, *United States v. Bd. of Educ. for Sch. Dist. of Phila.*, 911 F.2d 882, 892 (3d Cir. 1990) ("Where the allegedly discriminatory policy is openly declared—in this case it was, among other things, published in the Pennsylvania Code—then proof that the policy was

actually being followed consistently is not necessary in order to obtain an injunction against subsequent implementation. In short, if the [statute] in itself represents a policy in conflict with Title VII, then the district court erred in failing to enjoin the Commonwealth from enforcing that statute.") (internal citations omitted); *see also EEOC v. Hickman Mills Consol. Sch. Dist. No. 1*, 99 F. Supp. 2d 1070, 1076 (W.D. Mo. 2000) (Age Discrimination in Employment Act case concluding that "[a] policy is facially discriminatory and constitutes direct evidence when the terms of the policy classify employees based upon their protected trait, without regard to the employer's motives for using the protected trait in such a manner . . . . Each benefit plan reduced the benefits available based solely upon the age of the employee. This is direct evidence of discrimination.").

Other jurisdictions agree. For example, in *Doherty Enterprises*, "[p]laintiff allege[d] that [an] arbitration agreement constitute[d] a pattern and practice of resistance to the full enjoyment of rights secured by Title VII." 126 F. Supp. 3d at 1307. The defendant "move[d] to dismiss on the . . . grounds . . . the Complaint fail[ed] to allege any unlawful discrimination or retaliation under Title VII." *Id.* The district court rejected that argument, reasoning that pattern or practice claims are not limited to traditional unlawful employment practices like "discrimination and retaliation," because "the clear language in section 707(a) . . . prohibits *resistance* to the full enjoyment of *any* rights secured by Title VII." *Id.* at 1311 (emphases added).

Similarly, in *EEOC v. Catholic Healthcare West*, 530 F. Supp. 2d 1096 (C.D. Cal. 2008), the "EEOC argue[d] that [the defendant] engaged in a pattern or practice of sex discrimination for at least as long as Policy # 76300.802 was in effect." *Id.* at 1101.

Agreeing, the court found "that there [was] no issue of fact as to whether the policy in question discriminate[d] on its face" because "[t]he language clearly classifie[d] pregnant people (and therefore, only women) in a manner that would tend to deprive them of employment in a fluoroscopy lab." *Id.* at 1102. Thus, unless "the defendant . . . present[ed] a valid [bona fide occupational qualification], . . . a violation of Title VII ha[d] been established. Period." *Id.* at 1104. The court dismissed the employer's argument that "two alleged incidents cannot support the finding of a 'pattern or practice' of discrimination," because "it ignore[d] the fact that [the defendant's] official policy discriminated on its face." *Id.* Defendants cite no contrary binding precedent on which their motion to dismiss can rest.

Defendants' chief case, *EEOC v. CVS Pharmacy, Inc.*, 809 F.3d 335 (7th Cir. 2015), is a nonbinding out-of-circuit case which is, in any event, inapposite**.** Memo 19. At issue there was "a severance agreement that could deter terminated employees from filing charges with the EEOC or participating in EEOC proceedings." *Id.* at 336. It was undisputed that these severance agreements were pursued without regard to the employees' protected characteristics. In other words, these agreements simply operated as a traditional waiver of liability. The government, however, alleged that "CVS was engaged in a pattern or practice of resistance to the full enjoyment of rights guaranteed under Title VII by, among other things, 'conditioning the receipt of severance benefits on . . . employees' agreement to a Separation Agreement that deters the filing of charges and interferes with employees' ability to communicate voluntarily with the EEOC." *Id.* at 338. The court disagreed with the government's position, holding that "Section 707(a) does not create a

broad enforcement power for the EEOC to pursue *non-discriminatory* employment practices that it dislikes." *Id.* at 341 (emphasis added). That is an unremarkable holding. The facially neutral release provisions did not discriminate on account of any protected basis, so they were deemed a "non-discriminatory employment practice" insufficient for a Title VII claim. Here, though, the offending terms of the CBA classify and limit employees based on their protected characteristics in a way that would adversely affect their employment status. That is enough to violate the text of Section 703(a)(2) and for the Attorney General to bring a claim under Section 707 to stop such a "pattern or practice of resistance to the full enjoyment" of rights secured by Section 703(a)(2). *See Bd. of Educ.*, 911 F.2d at 892.[4]

Defendants' additional argument that the racial provisions do not establish a pattern or practice because they are exceptions to the seniority system is self-defeating. Memo 21-23. First, the exceptions favor "underrepresented" people and harm non-underrepresented people, which Defendants do not contest. Second, the exceptions apply whenever the conditions are met (e.g., if a teacher is next in line to be involuntarily reassigned, he will be passed over if he is from an "underrepresented" population). Thus, the exceptions—the racial classifications and consequent limiting of employees in ways that adversely affect

---

[4] To the extent *CVS* holds that the only right secured by Title VII is the "right to be free from workplace discrimination and retaliation," *id.* at 341, this Court should not agree. Section 703(a) expressly prohibits not only "discriminat[ion]" under Section 703(a)(1) but also "limit[ing], segregat[ing], and classify[ing]" unlawfully under Section 703(a)(2). Alternatively, this Court should conclude that the mere fact of classifying people based on their protected characteristics is in and of itself discriminatory, because it sends a message to employees or prospective employees that some individuals are less valuable simply because of their genetics.

them based on protected characteristics—are the pattern. *See Bd. of Educ.*, 911 F.2d at 892.

## 2. *Weber* and *Johnson* do not save the challenged CBA provisions.

### a. *Weber* and *Johnson* are no longer good law.

A series of Supreme Court decisions since the 2000s have vitiated cases that Defendants believe save their illegal provisions. Defendants claim that "the challenged CBA provisions are permissible under *United Steelworkers of America v. Weber*, 443 U.S. 193 (1979), and *Johnson v. Transportation Agency, Santa Clara County, California*, 480 U.S. 616 (1987)" because they are the type of voluntary affirmative action programs that those cases supposedly allow. Memo 24. But *Ricci v. DeStefano*, 557 U.S. 557 (2009), *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020), *Students for Fair Admission, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) (*SFFA*), and *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303 (2025), cast doubt on Defendants' position.

The *Weber* Court looked past clear statutory text to hold that the "spirit" of Title VII authorizes "the private sector voluntarily to adopt affirmative action plans designed to eliminate conspicuous racial imbalance in traditionally segregated job categories." *Id.* at 201, 209. The Court envisioned these plans as "temporary measure[s] . . . not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance." *Id.* at 208. Unfortunately, this "introduce[d] into Title VII a tolerance for the very evil that the law was intended to eradicate." *Id.* at 254-55 (Rehnquist, J., dissenting). Eight years later, in *Johnson*, the Court extended *Weber* to public employers and sex-based affirmative action. 480 U.S. at 639-42. In so doing, the Court "complete[d] the process of converting [Title VII] from a guarantee that race or sex will not be the basis for employment determinations,

15

to a guarantee that it often *will*." *Id*. at 658 (Scalia, J., dissenting).

In recent years, the Court has restated a textual understanding of Title VII that erodes *Weber* and *Johnson*. The *Ricci* Court held that "under Title VII, before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *Ricci*, 557 U.S. at 585. In *Bostock*, the Court "determine[d] the ordinary public meaning of Title VII's command that it is 'unlawful . . . for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" 590 U.S. at 655 (quoting 42 U.S.C. § 2000e–2(a)(1)). It held that "Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656. Importantly, in contrast to *Weber*'s atextual divining of the "spirit" of Title VII, *Bostock* reiterated that for purposes of interpreting Title VII, "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Id.* at 653.

*SFFA* additionally confirmed that "ameliorating societal discrimination does not constitute a compelling interest that justifies race-based state action." *SFFA*, 600 U.S. at 226. The Court reminded that "[r]acial discrimination [is] invidious in all contexts," *id.* at 214, and "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality,"

*id.* at 208. And Title VII of course cannot be interpreted in a way that would authorize discriminatory government action that the Constitution prohibits. *See Ames*, 605 U.S. at 314 n.1 (Thomas, J., concurring) (noting that imposing different burdens for Title VII plaintiffs depending on whether they are from a majority or minority group "is also plainly at odds with the Constitution's guarantee of equal protection.").

Finally, just last year, the Court unanimously reaffirmed that Title VII prohibits discrimination against whites on the same terms as racial discrimination against nonwhites. *Id*. at 310. "Majority-group" Title VII plaintiffs cannot be subjected to a higher pleading standard. *Id.* at 311. This emanates from the principle that "[d]iscriminatory preference for any group, minority *or majority*, is precisely and only what Congress has proscribed" in Title VII. *Id*. at 310 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)).

Together, these cases teach that terms favoring an underrepresented group determined by protected characteristics is not justified even to remedy perceived past societal discrimination. Only "two compelling interests . . . permit resort[ing] to race-based government action. One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and the other is "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *SFFA*, 600 U.S. at 207. Neither exception is at play here.

*Ricci*, *Bostock*, *SFFA*, and *Ames* collectively demonstrate that there is no textual basis for courts to continue allowing overt racial workforce balancing under the guise of affirmative action. *Weber* and *Johnson* have been effectively overruled, and Defendants'

17

arguments thereunder must fail.[5]

      b.     <u>The United States did not need to preemptively disprove
Defendants' affirmative defense.</u>

Even if *Weber* and *Johnson* remain good law, their applicability to the provisions
here is a question of fact that *Defendants* need to prove, and the United States to counter,
at a later point. As Defendants explain, the challenged provisions "(1) have remedial
purposes; (2) don't unnecessarily trammel non-minority interests or create absolute bars;
(3) are temporary; and (4) don't require discharge of non-minority workers." Memo 25. As
those factors make evident, Defendants are raising an affirmative defense which requires
considerable factual development. But "a defendant cannot render a complaint defective
by pleading an affirmative defense, and so the possible existence of [an affirmative]
defense 'is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself
establishes the defense.'" *Weatherly v. Ford Motor. Co.*, 994 F.3d 940, 943 (8th Cir. 2021).
Plus, "factual disputes [are] . . . not amenable for resolution on a motion to dismiss." *Boyd
v. Target Corp.*, 750 F. Supp. 3d 999, 1012 (D. Minn. 2024). The Complaint does not
establish Defendants' defense. It instead pleads instances of racial classification, limitation,
and discrimination based in the CBA's provisions, and that "Defendants' claim that 'past
discrimination . . . resulted in a lack of diversity of teachers' is not supported by any
analytical process or factual basis." Compl. ¶ 29. That is sufficient to state the relevant
claims, and the United States need not have preemptively refuted Defendants' affirmative

---

[5] The United States preserves this argument for appellate review, acknowledging that only
the Supreme Court may overrule itself. *Fleck v. Wetch*, 937 F.3d 1112, 1115 (8th Cir.
2019).

defense.

        c.    <u>The contested CBA provisions would not survive under</u>
              <u>*Weber* and *Johnson*.</u>

In any event, Defendants have not proven that the challenged terms are lawful under *Weber* and *Johnson,* requiring dismissal of the Complaint. The CBA mentions as justification for Article 15 only that "[p]ast discrimination by the District disproportionately impacted the hiring of underrepresented teachers in the District, as compared to the relevant labor market and the community, and resulted in a lack of diversity of teachers." Miller Decl., Exh. 1, 2023-25 CBA, ECF 11-1 at 200 (incorporated by reference in the Complaint). This is a conclusory justification not even close to a factual showing—if Defendants were to assert their *Weber* defense at the summary judgment phase (where it might actually be appropriate to raise), their "bare assertion" would not be sufficient to make a factual showing. *Artz v. Bank of America, N.A.*, 883 F. Supp. 2d 792, 796-97 (D. Minn. 2012). Defendants will need to establish how "old patterns of racial segregation and hierarchy" resulted in a "manifest racial imbalance" and underrepresented populations being closed off from teaching, not just a lack of diversity, because maintaining racial balance is not a justified reason. *Weber*, 443 U.S. at 208.

Nor do Defendants show how the contested provisions are temporary. The CBA states that the race- and sex-conscious provisions "will no longer be in effect once the teachers in the District reflect the diversity of the labor market and the community served by the District." 2023-25 CBA at 200. An affirmative action plan under *Weber* must be aimed toward correcting a "manifest racial balance" in the field that resulted from

underrepresented populations being closed off to teaching in MPS, *Weber*, 443 U.S. at 208, not just to maintain some sort of amorphous balance with the "diversity of the labor market" and the community. Defendants' vague criteria escape numerical accountability. What does it mean to "reflect the diversity" of the labor market or community? What populations are included and are they counted together or separately for purposes of calculating "diversity"? And who decides? The provisions thus offer no concrete endpoint or mechanism for determining when enough is enough. And disturbingly, the provisions are prone to trammeling the interests of non-minorities by subverting the normal seniority-based processes and subjecting them to excessing, involuntary reassignment, de-prioritization for reinstatement, and layoff to bypass underrepresented teachers who otherwise would be subjected to the adverse employment actions based on seniority. *See also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 282-83 (1986) (in an Equal Protection case where school board "la[id] off nonminority teachers with greater seniority in order to retain minority teachers with less seniority," the Court held that "layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives. That burden is too intrusive.").

Accordingly, even if *Weber* and *Johnson* are still good law, and even if this affirmative defense were resolvable on a motion to dismiss (and it is not), Defendants have not shown that they satisfy even the permissive *Weber/Johnson* standards, and therefore their motion should be denied.

## II.    The Attorney General Has Standing to Assert Violations of Section 703(a) Under Section 707.

### A.    Rule 12(b)(1) Standard

"Federal jurisdiction is limited by Article III of the Constitution to cases or controversies; if a plaintiff lacks standing to sue, the district court has no subject-matter jurisdiction." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016).

Section 707 gives the Attorney General standing to sue when she "has reasonable cause to believe" that an employer "is engaged in a pattern or practice of resistance to the full enjoyment of any rights secured by [Title VII], and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights." 42 U.S.C. § 2000e-6. The establishment of reasonable cause is an internal step not judicially reviewable. *See, e.g.*, *EEOC v. Caterpillar, Inc.*, 409 F.3d 831, 833 (7th Cir. 2005) (in a Title VII suit brought by the EEOC, "[t]he existence of probable cause to sue is generally and in this instance not judicially reviewable"); *United States v. Bldg. & Const. Trades Council of St. Louis*, 271 F. Supp. 447, 453 (E.D. Mo. 1966) ("[N]owhere does it indicate that the Attorney General is required to plead reasonable cause. His signature is in effect a certification of such reasonable cause.").

### B.    The United States properly brought an enforcement action under its statutory authority; alleging harm to a specific person was not required for jurisdiction.

The United States properly sued under its statutory enforcement authority after developing reasonable cause to believe Defendants' CBA provisions violate Title VII. Under Section 707, once the Attorney General has "reasonable cause" to believe an

21

employer is engaged in an unlawful pattern or practice under Title VII, she need satisfy only three requirements: (1) sign a complaint; (2) set forth the relevant facts in the complaint; and (3) request relief. 42 U.S.C. § 2000e-6.[6] Defendants have not claimed the United States has failed to fulfill any of these requirements.

As discussed, *see* Section I.B.1, neither Section 707 nor Section 703(a) on which the United States' Section 707 claim relies, require the government to allege the existence of injured parties to establish the employer is engaged in an unlawful pattern or practice. 42 U.S.C. § 2000e-6 (setting forth requirements for pattern or practice complaint); *see also, e.g.*, *EEOC v. Doherty Group, Inc.*, No. 14-cv-81184, ECF No. 124 (Second Amended Compl. not alleging specific parties harmed) (S.D. Fla. Apr. 26, 2016). Yet Defendants import this atextual requirement from numerous cases brought by *private plaintiffs* who were required to show how they were injured. Memo 10-14. Conversely, once the Attorney General makes a reasonable cause determination, she may bring suit without alleging harm to any individual if such harm is not necessary for the determination. The lack of an identified victim of Defendants' policies does not deprive the United States, acting in its sovereign capacity, of standing under Section 707. The Attorney General's determination that reasonable cause exists to believe that an unlawful pattern or practice is occurring is sufficient to establish the case or controversy.[7]

---

[6] Authority to investigate and litigate Section 707 suits has been delegated to the Assistant Attorney General for the Civil Rights Division. Dep't of Justice Manual 8-1.100; 8-2.211.

[7] To be sure, the Court or a jury may ultimately conclude that the Attorney General is incorrect in her determination and that no Title VII violation has taken place. But that is a

The sole case that Defendants cite in support of their standing argument in which the United States is the plaintiff is inapposite. In *United States v. City of Tampa*, 739 F. Supp. 3d 1055 (M.D. Fla. 2024), the court rejected "sweeping injunctive relief" in a proposed consent decree for a discriminatory parental leave policy that, by the time the consent decree was proposed, had been superseded. *Id.* at 1059. The problem with the proposed injunctive relief, the court explained, was that the parties did not stipulate or provide evidence that any sort of discrimination was ongoing that would justify the proposed injunction. The court conceptualized the problem as one of standing, that the United States had not shown "a 'certainly impending' risk of future discrimination to justify seeking forward-looking relief." *Id.* at 1065. Though the court concluded that the United States did not have standing to pursue forward-looking injunctive relief because the United States did "not allege . . . that Tampa [was] *currently* discriminating," it explicitly held that "[t]he United States has standing to seek relief remedying that past harm." *Id.* at 1064 (emphasis added).[8]

---

merits rather than a standing issue and therefore not amenable to resolution on a Rule 12(b)(1) motion to dismiss for lack of jurisdiction.

[8] Given these holdings, *City of Tampa* was more about mootness than standing. Mootness has sometimes been described as a component of standing. *See, e.g.*, *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) ("Mootness has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'") Yet, the inquiries are analytically distinct. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189-94 (2000). Perhaps for this reason, the *City of Tampa* court did not dismiss the case, as it would be required to do had the United States lacked standing. Rather, it denied a particular form of requested relief and explicitly invited the parties to "move for entry of an amended consent judgment consistent with [its] Order." 739 F. Supp. 3d at 1068.

Here, though, the United States *has* alleged that the offending CBA provisions remain in force and thus create continuing contractual obligations. Compl. ¶ 13. Defendants have not claimed otherwise, even with a tentative successor agreement, Memo 3. Under the terms of the CBA, Defendants must unlawfully classify their teachers and apply the racial limitations when triggering circumstances occur (i.e., excessing, involuntary reassignments, and reinstatements). Thus, unlike in *City of Tampa*, Defendants here are *currently* unlawfully discriminating, classifying, and limiting teachers based on race, color, sex, and national origin. Therefore, to the extent the United States needs to allege ongoing or imminent harm to bring suit (which it does not need to, *see* Section I.B.1), it has met that burden.

**C.     The United States' claims regarding Black Men Teach are not mooted by the MOA's expiration.**

Defendants aver that the United States' claims regarding the Black Men Teach MOA are mooted by the MOA's expiration. Memo 15-16. But Defendants voluntarily chose not to renew the agreement and thus have not overcome the heavy burden of the voluntary cessation doctrine.

"[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000). "Voluntary cessation does not moot a case or controversy unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Parents Involved in Comm. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007). "The 'heavy burden

of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Laidlaw*, 528 U.S. at 189.

Here, the Complaint alleges that prior to filing suit, the United States notified Defendants of its determination that their contested terms were unlawful. Compl. ¶¶ 82, 86. Defendants in turn argue that the Black Men Teach MOA has expired (presumably to imply that it will not be renewed) and that the claims related to the Black Men Teach MOA are moot. Memo 15-16. It is plausible to infer that Defendants decided not to renew the program after the United States began its investigation, issued its notice of findings, or filed suit. Yet Defendants fail to address how the Black Men Teach program could not reasonably be expected to recur or represent that they do not intend to reinstate a similar program, which is their burden. That it is apparently not in the tentative, yet-unsigned 2025-2027 CBA is cold comfort. Miller Decl. ¶ 6. Defendants may very well reinstate a Black Men Teach program in yet another future CBA.[9]

_____

[9] Defendants' mootness argument is a facial challenge to jurisdiction such that "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Carlsen*, 833 F.3d at 908. This is because their argument is based solely on the expiration date of the Black Men Teach MOA, which is referenced in the Complaint. But to the extent it is a factual challenge based on Defendants' declaration and accompanying exhibits showing non-renewal of the Black Men Teach program, Miller Decl. ¶¶ 3-6, then for that limited challenge the Court may consider evidence outside the Complaint. *Carlsen*, 833 F.3d at 908. But even as a factual challenge, Defendants lose, because under that framework, the United States would request the Court to judicially notice its letters notifying Defendants of its investigation and then its findings that the challenged provisions are illegal. Jones Decl. ¶¶ 2-4; Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). Sent in May and September 2025 respectively, these letters establish that before Defendants' December 2025 decision

The United States also alleged that Defendants "implement[ed] preferences based on race, color, national origin, or sex, as required by the [Black Men Teach] MOA." Compl. ¶ 84. Discovery may reveal MPS teachers who suffered injury as a consequence of these preferences. Such teachers would be entitled to equitable relief as contemplated in the United States' prayer for relief. Compl. 19 (requesting "[a]n award of all such other additional relief as the interests of justice may require"). The Black Men Teach-related claims therefore remain active.

Thus, the Complaint's claims regarding the Black Men Teach MOA are not moot, and both Count 1, alleging violations based on both Article 15 and the Black Men Teach MOA, and Count 2, alleging violations based on the Black Men Teach MOA, should proceed.

## III. The Union Is Not a Required or Indispensable Party Under Rule 19(a).

### A. <u>Rule 12(b)(7) Standard</u>

"[D]etermining whether a non-party is an indispensable party is a two-step process. First, the court must determine whether the non-joined party is a 'required' (necessary) party under Rule 19(a)(1)." *Chase v. Andeavor Logistics, L.P.*, 165 F.4th 1102, 1120 (8th Cir. 2026). A party is required if the court cannot accord complete relief among existing parties or that party claims an interest relating to the subject of the action and disposing of

---

not to renew the Black Men Teach program, Defendants were on notice of the investigation and its findings, thus making Black Men Teach a program they voluntarily ceased afterward (and thus not moot). In the alternative, the United States requests leave of Court to amend the Complaint.

the action in the party's absence may impair or impede their ability to protect the interest or subject existing parties to a substantial risk of incurring inconsistent obligations. Fed. R. Civ. P. 19(a). If the party is required but it is infeasible to join it, then the court must decide whether "the action should proceed or be dismissed," i.e., whether the presence of the party is indispensable to the action. *Chase*, 165 F.4th at 1120.

    B.    **The Union is not a required party under Rule 19(a); if it is, joinder is feasible; and even if joinder is not feasible, this case can proceed without the Union.**

The Union is not a required party because full relief (enjoining enforcement of the severable illegal CBA provisions and declaring that they violate Title VII)[10] can be afforded without its involvement, and injunctive relief will not prejudice its rights because any terms found illegal would be severable and the Union has no right to include illegal provisions in its CBAs. But if the Court finds that the Union is a required party, joinder is feasible. The Union may be joined as a party for the limited purposes of effectuating complete relief and protecting its interests. While the Attorney General may not sue the Union as an adverse defendant, Rule 19 allows joinder for those limited purposes. Finally, even if this Court were to find that joinder is infeasible, this case may continue without the Union for the same reasons the Union is not a required party: the relief sought here (declaring the challenged provisions illegal and enjoining their enforcement) is both narrow enough that it would not prejudice the Union (because the contested terms would be severable and it has no right to violate the law) and adequate enough for the United States.

---

[10] The United States' separate request for any other relief required in the interests of justice, Compl. 19, does not impact the Union either.

In addition, Defendants' interests in this matter are essentially aligned with the Union's (perpetuation of the provisions at issue), so Defendants are already defending the Union's interests. On the other hand, dismissal would allow the plainly racial classifications to remain, which would be severely prejudicial to the United States and the public interest in the fair enforcement of civil rights law under Title VII.

> **1.    The Union is not a required party for either full relief to the United States or protection of the Union's interests as a party to the CBA.**

Though a signatory to the CBA that contains the provisions at issue in this case, the Union is not a required party because full relief—enjoining enforcement of the severable illegal CBA provisions and declaring that they violate Title VII—can be afforded without its involvement, and injunctive relief will not prejudice the Union's rights because the enjoined provisions would be illegal, and therefore severable, and the Union has no right to include illegal provisions in its CBAs. A party is required if, in its absence, "the court cannot accord complete relief among existing parties," or if its absence would "impair or impede" its interests or subject an existing party to "substantial risk" of incurring "inconsistent obligations." Fed. R. Civ. P. 19(a)(1). The Union's absence risks none of these things, so the Union is not a required party.

*Complete relief among existing parties*. The United States asks that (1) the challenged provisions be declared illegal, (2) Defendants not implement the provisions at issue, and (3) similar provisions never again be part of Defendants' CBA. Compl. 19. The Union need not be a party for such relief. The Court need only order Defendants not implement the provisions, and they need only comply. The Union's involvement in this

case is unnecessary to comply with such an order. Nor do Defendants need the Union's cooperation to not enter the offending provisions again. Unless Defendants are claiming that they have a legal obligation to accept whatever terms the Union offers in negotiations, they need only tell the Union that they are enjoined from entering into "substantially similar" terms if the Union offers them. Compl. 19.

*The Union's interest in the terms of the CBA.* Under the CBA's severability clause, if "any provision[] . . . shall be found contrary to state or federal law, then this provision . . . shall be deemed invalid . . . , but all other provisions . . . shall continue in full force and effect," so the rest of the CBA remains intact. 2023-2025 CBA ¶ 1.3.4. Thus, the Union need not join this action to protect any other "negotiated terms and conditions of employment" and the "integrity of [the] negotiated agreement[s]." Memo 29-30.

Adding a belt to these suspenders, illegal CBA terms are unenforceable as a matter of law. *See Boehringer Ingelheim Vetmedica, Inc. v. United Food & Commercial Workers*, 739 F.3d 1136, 1141 (8th Cir. 2014). The Union therefore has no legally cognizable interest in their implementation as a party to the CBA. *See also Dunlop v. Beloit College*, 411 F. Supp. 398, 401 (W.D. Wisc. 1976) (an employer's obligation to follow the law "supersede[s] any obligation which it had under a collective bargaining agreement" and "cannot be waived by private agreements . . . between employers and labor unions"); *Acree v. Tyson Bearing Co.*, No. 01-cv-175, 2002 WL 463263, at *5 (W.D. Ky. Jan 17, 2002) ("[C]omplete relief can be afforded between Plaintiffs and Tyson even in the Union's absence. The Court has full power to order equalization of pay rates, which would be both effective and complete as to Plaintiffs and Tyson. . . . [T]he Court's declaration would

29

supersede any contrary provision in the collective bargaining agreement.").

    *No inconsistent obligations for Defendants*. For substantially the same reasons, Defendants do not face "conflicting legal obligations." Memo 29. Defendants claim that the Union "could file a grievance demanding MPS comply with the CBA," or "file an unfair labor practice charge against MPS for unilaterally altering or failing to honor negotiated terms." Memo 29. But again, the severability clause makes clear that if the Court concludes that the contested provisions violate federal law, they become invalid, while the rest of the CBA continues intact. Moreover, the Eighth Circuit has held that the Rule 19 inquiry "focus[es] . . . on relief between the parties and not on the speculative possibility of further litigation between a party and an absent person." *Gwartz v. Jefferson Mem. Hosp. Ass'n*, 23 F.3d 1426, 1428 (8th Cir. 1994). In any event, Defendants face no legal obligation to defend terms that would no longer be valid. Were the Union to sue to enforce the unlawful provisions, the suit would be frivolous. A possibility of such a suit does not present a "substantial risk" to the Defendants. *See Dunlop*, 411 F. Supp. at 401 ("Were the Union to bring suit against defendant to challenge the payment of higher, equalized wage rates to female employees after a judicial determination that defendant was obligated to equalize its wage rates, such a suit would have to be characterized as frivolous. The risk of being party to a frivolous lawsuit is not the 'substantial' risk contemplated by Rule 19."). This Court has held that "[i]n determining the substantiality of the risk [under Rule 19], this Court is obligated to assess the likelihood of absent persons bringing suit and prevailing on the merits against the present defendants." *deVries v. Weinstein Int'l Corp.*, 80 F.R.D. 452, 460 (D. Minn. 1978). If this Court were to hold the offending provisions to

be illegal, it would be highly unlikely the Union would bring an action it would most certainly lose.

The concerns raised in favor of joining a union in *National Organization for Women, Inc. v. Minnesota Mining & Manufacturing Co.*, 73 F.R.D. 467 (D. Minn. 1977) (*NOW*); *see* Memo 29, are not at play given the nature of the allegations here and the narrow relief sought. There, plaintiffs alleged "sexually discriminatory employment practices," and sought wide-ranging relief, including "affirmative action to eliminate the results of past practices and award[ing] restitutionary back pay." *NOW*, 73 F.R.D. at 469. There was a chance that the union would be "liable for past discrimination" and thus "liable for any award of back pay which the court might order to remedy discriminatory practices which may be embodied in the collective bargaining agreements." *Id.* at 470. Also, the case involved a certified class, so joinder also ensured "that the interests of 3M employees who are not members of the certified class will be represented." *Id.* The relief that the United States seeks here does not implicate the Union, so "the court would be able to fashion a type of relief that would eliminate the discrimination complained of . . . without affecting prejudicially the rights of the union[] or its members." *Id.* at 469. And to the extent the "right" involved is the right to the racial classifications, no such right would exist if this Court were to conclude that they violate federal law, as discussed.

For these reasons, the Union is not a required party under Rule 19(a).

**2.    If the Union is a necessary party, its joinder is feasible as a party for the limited purposes of effectuating complete relief and protecting its interests.**

Even if the Court were to find that the Union is a required party, Rule 19 permits joining the Union as a non-liability party for the limited purposes of effectuating complete relief and protecting its interests. Defendants argue that joinder is infeasible because only the EEOC can sue a private entity like a union. Memo 30-31. This argument misapprehends joinder under Rule 19. Precedents across multiple jurisdictions confirm that a third party may be joined under Rule 19 not as a defendant adverse to a government plaintiff like the United States or the EEOC but for the limited purposes of effectuating complete relief between the existing parties and defending the interests of the joining party.

"[A] plaintiff's inability to state a direct cause of action against an absentee does not prevent the absentee's joinder under Rule 19," because "[a]n absentee can be joined under Rule 19 in order to subject it, under principles of res judicata, to the 'minor and ancillary' effects of a judgment." *EEOC v. Peabody Western Coal Co.*, 610 F.3d 1070, 1079 (9th Cir. 2010) (discussing joinder of Native American tribe in Title VII suit where EEOC had no jurisdiction to sue it). The Ninth Circuit explained that the "EEOC has no claim against the party it seeks to join and is not seeking any affirmative relief directly from that party. Joinder is necessary for the 'sole purpose' of effecting complete relief between the parties . . . by ensuring that both [the employer] and the [tribe] are bound to any judgment upholding or striking down" a provision between the tribe and employer that mandated favoring tribe members in hiring. *Id.*

The Sixth Circuit came to the same conclusion in *EEOC v. MacMillan Bloedel*

*Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974). There, a union was joined under Rule 19 in a case where it was "not charged with a Title VII violation." *Id.* at 1095. The court held that "the EEOC followed the proper course when it joined the Union under Rule 19(a)," because "[s]uch an opportunity will allow the Union to protect adequately the interests of its members, will provide the discriminatee with full and complete relief and will also insure that the suit is handled at one time and in one forum." *Id.*

For those limited reasons, unions have been joined in cases brought by the United States. *See, e.g.*, *United States v. Consolidated City of Jacksonville*, No. 12-cv-451 (M.D. Fla.), ECF 1 (Compl.), ¶ 7 ("Defendant Jacksonville Association of Firefighters, Local 122, IAFF, an affiliated and/or chartered Local with the International Association of Firefighters ('Union'), . . . is named solely as a party pursuant to Rule 19(a) . . . because its joinder is necessary for complete relief."); *United States v. Nassau Cnty.*, No. 77-cv-1881, Compl., ¶ 9 (E.D.N.Y.) ("Defendant [Nassau County Patrolmen's Benevolent Association] is named as a defendant in this action pursuant to Rule[] 19[.]"), found at *United States v. City of New York*, No. 07-cv-2067, ECF No. 22-6 (E.D.N.Y.).

Thus, if the Court finds that the Union is a required party, the Court may join it. Fed. R. Civ. P. 19(a)(2) (Joinder by Court Order).

### 3. Even if joinder of the Union is infeasible, this action can proceed without prejudice to it or the existing parties.

For the same reasons Defendants claim that the Union is a required party, they contend that if the Union cannot be joined, this case must be dismissed. They specifically argue that the Union's rights are violated if the CBA provisions at issue are found illegal

without their participation; no other measures short of joinder would suffice; judgment rendered in their absence would be inadequate because the Union would attack it; and the United States would have an adequate alternative remedy by filing a Section 706 suit challenging the enforcement of the provisions against an individual or group, presumably without affecting the Union's interests as a whole. Memo 31. These arguments fail.

If a required party cannot be joined, a court evaluates four factors: "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties"; "(2) the extent to which any prejudice could be lessened or avoided"; "(3) whether a judgment rendered in the person's absence would be adequate"; and "(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b). The four factors support maintaining this action, for the same reasons the Union is not a required party. *See* Section III.B.1.

*Prejudice to the Union and the extent to which it can be avoided*. Under the severability clause, the rest of the CBA would remain effective so an adverse judgment on Defendants would not prejudice the Union. In any event, the Union has no right to illegal CBA terms. Prejudice would also be avoided because of the narrow nature of the relief (declaring the challenged provisions illegal and enjoining their enforcement) and because Defendants are already defending the very terms that the Union would defend. *See Curry v. Regents of Univ. of Minn.*, 167 F.3d 420, 423 (8th Cir. 1999) (holding that when putative intervenor and existing party had the same interest, the intervenor's interests were adequately represented even if the parties' motives were not identical). And if the Union wants to defend the offending terms as a party to the CBA, the Court need not act unless

the Union tries to intervene under Rule 24.

*Prejudice to existing parties and adequacy of the judgment.* Nor is there prejudice to the United States. All the federal government requests are a declaration regarding the CBA provisions' legality and an injunction against their present or future implementation. Compl. at 19. As explained above, the Union need not be a party for that relief to be effective. And contrary to Defendants' claim that the Union could collaterally attack the judgment, rendering it inadequate, Memo 31, a finding that the terms at issue are illegal would supersede any claim the Union has to defend those specific terms (and if it tries, such a suit would be both "speculative" and "frivolous"). *See* Section III.B.1.

*No remedy for plaintiff if case dismissed.* Dismissal would leave the government with no adequate remedy. If the case is dismissed, the United States would not be able to enforce Title VII's prohibition of unlawful racial classifications and limitations against a public school district with plainly racial classifications and limitations in its employment procedures. This would create a loophole for any public employer to embed discriminatory provisions in a CBA with a private union. And Defendants' solution misapprehends the claims the United States brings. Defendants suggest that the United States can wait for a charge to bring a claim under "Section 706 of Title VII." Memo 31. But the United States is bringing a "pattern and practice" claim under Section 707, as is its right if it has reasonable cause to believe Defendants are violating Title VII, and the active terms at issue readily meet that (unreviewable) standard. *See Bd. of Educ.*, 911 F.2d at 892. The claims here are not based on specific or isolated acts of discrimination more suited to Section 706 claims.

Thus, this case should proceed even in the Union's absence if it cannot be joined.

But the Union is not required in the first place, and even if it is, joinder is feasible.

## **CONCLUSION**

For all the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Dated: March 2, 2026

<div align="center" style="margin-left:40%">

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ERIC SELL
Deputy Assistant Attorney General

HILARY PINION
Acting Chief

/s/ *Brandon T. Wrobleski*
BRANDON T. WROBLESKI
(VA Bar. No. 89697)
Acting Deputy Chief
ALLEN L. HUANG
(CA Bar No. 309123)
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Employment Litigation Section
150 M Street N.E., Suite 9000
Washington, D.C. 20002
(202) 213-4470
Brandon.Wrobleski@usdoj.gov
Allen.Huang@usdoj.gov

*Attorneys for United States of America*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 2, 2026, I electronically filed the foregoing Opposition to Defendants' Motion to Dismiss with the Clerk of Court by using the CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Brandon T. Wrobleski*
BRANDON T. WROBLESKI