UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,
                                                    Case No. 25-CV-4571 (PJS/DJF)

                  Plaintiff,

v.                                                  ORDER

BOARD OF DIRECTORS OF SPECIAL
SCHOOL DISTRICT NO. 1,
MINNEAPOLIS PUBLIC SCHOOLS;
SPECIAL SCHOOL DISTRICT NO. 1, THE
MINNEAPOLIS PUBLIC SCHOOLS; and
LISA SAYLES-ADAMS, Superintendent,

                  Defendants.

Allen L. Huang and Brandon T. Wrobleski, UNITED STATES DEPARTMENT OF JUSTICE, for plaintiff.

Timothy A. Sullivan, RATWIK, ROSZAK & MALONEY, P.A., for defendants.

Plaintiff United States of America brings this pattern-or-practice employment-discrimination action against the Minneapolis Public Schools pursuant to its enforcement authority under Section 707(a) of Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e-6(a). Specifically, the United States seeks to invalidate two provisions in a collective-bargaining agreement ("CBA") between, on the one hand, defendants the Board of Directors of Special School District No. 1, Minneapolis Public Schools; Special School District No. 1, the Minneapolis Public Schools; and Lisa Sayles-

Adams (collectively, "MPS") and, on the other hand, the Minneapolis Federation of Teachers, Local 59 (the "Union").  Notably, the United States did not sue the Union, presumably because the Attorney General's enforcement authority extends only to governmental entities.  *See* 42 U.S.C. § 2000e-5(f)(1).

This matter is before the Court on MPS's motion to dismiss under Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 12(b)(7).  ECF No. 8.  For the reasons that follow, the Court grants MPS's motion in part and dismisses the complaint without prejudice pursuant to Rules 12(b)(1) and 12(b)(7).

## I.  BACKGROUND

The United States challenges two provisions in the 2023–2025 CBA between MPS and the Union.  One of the challenged provisions did not survive the now-expired CBA, but the other was continued into the successor (and current) CBA.[1]

The first challenged provision is Article 15, which governs MPS's procedures for teacher "Transfer, Reassignment, and Recall," and which was carried over into the current CBA.  *See generally* CBA § 15; Compl. ¶¶ 31–60, 79, ECF No. 2.  In general, "[w]hen staff reductions occur" at a particular school, teachers must be "excessed" (i.e.,

---

[1]Citations to the "CBA" refer to the 2023–2025 Teacher Contract, Memoranda & Policies, available at the permalink cited in the complaint, Compl. ¶ 12 n.2, ECF No. 2, and attached as Exhibit 1 to the first declaration of Alicia Miller, ECF No. 11-1.  After oral argument, MPS and the Union ratified a successor CBA for 2025–2027, which maintains the challenged Article 15 language, now in Article 16.  Second Miller Decl. ¶¶ 1–2, ECF No. 22; *id.* Ex. 5 § 16, ECF No. 22-1.  Because the parties briefed and argued the motion with reference to the 2023–2025 agreement, the Court uses its numbering.

laid off) in reverse-seniority order.  CBA § 15.2.5(b); *see also* Mot. Hr'g Tr. 3:23–4:1, ECF No. 24 (May 6, 2026) ("Tr.") (explaining that "excessing" is the term MPS uses to "refer to . . . an unrequested leave of [absence] or layoff, [or] reduction in force"); Compl. ¶¶ 31–32 ("A teacher is in 'excessed' status when a school or job site undergoes staff reductions, when a teacher returns from a leave of absence longer than a year, or when a teacher waives their right to return to a job before taking leave longer than a year.") (citing CBA § 15.2.5(a)).  In other words, "[t]he least senior teacher in the specific licensure areas/departments" will be excessed first.  CBA § 15.2.5(b).

But in the spring of 2022, following a three-week teachers' strike, *see* Compl. ¶ 20 n.4, MPS and the Union agreed to amend Article 15 to create a race-based exception to this seniority rule, purportedly in an effort "to remedy the continuing effects of past discrimination by the District" that "disproportionately impacted the hiring of underrepresented teachers," CBA § 15.1.2(i).[2]  Under this exception, when the teacher next in line for excessing "is a member of a population underrepresented among licensed teachers in the site," MPS must skip that teacher and instead lay off "the next least senior teacher[] who is *not* a member of an underrepresented population."  CBA

---

[2]According to the United States, the CBA's claim that teachers from certain (unidentified) racial and other "populations" are currently underrepresented and that the current underrepresentation was created by "past discrimination by the District" is not supported by any kind of study, analysis, or evidence.  Instead, says the United States, these statements were simply stuck in the CBA by negotiators in an attempt to provide legal cover for the racial discrimination mandated by Article 15.  *See* Compl. ¶ 29.

§ 15.2.5(b) (emphasis added).  Similar exceptions also apply with respect to involuntary reassignments, *id.* § 15.9.2(d), reinstatement, *id.* § 15.10.7(d), and district-wide layoffs, *id.* § 15.10.12(f).  *See* Compl. ¶¶ 34–36, 44–46, 54–57.

According to the United States, MPS uses the phrase "underrepresented populations" as "a proxy for a teacher's race, color, or national origin."  Compl. ¶ 19. MPS does not dispute that "underrepresented" is a proxy for at least race, but it does not seem to know how broadly the term sweeps beyond race.  Tr. 7:20–22.  For ease of reference, and because MPS struggled at the hearing to answer the Court's questions about which "populations" were and were not "underrepresented" for purposes of the CBA, the Court will refer to underrepresented teachers as "black" and "overrepresented" teachers as "white."  *See id.* 5:9–7:14, 12:22–25, 19:25–20:2.  Article 15's exception purports to be temporary, expiring "once the teachers in the District reflect the diversity of the labor market and the community served by the District." CBA § 15.1.2(i).  At the hearing, however, MPS also struggled to answer the Court's questions about the meaning and impact of this language.

The second challenged provision is a Memorandum of Agreement (the "MOA") between MPS, the Union, and Black Men Teach—an organization whose "stated goal is 'to build and engage a fellowship of Black male educators.'"  Compl. ¶¶ 61–62 & n.7. Under the MOA, Black Men Teach "Fellows" (all of whom are presumably black men) could interview for teaching positions at "a partnership elementary school" on a

preferred timeline, were exempted from the CBA's standard procedures "for excessing and lay-off," and received five additional days of paid leave each year to attend "professional development events" sponsored by Black Men Teach.  CBA at 235; *see also* Compl. ¶¶ 66–70.  The MOA was executed in July 2024, and it expired pursuant to its terms on June 30, 2025.  CBA at 235.

The complaint pleads two counts, both seeking declaratory and injunctive relief. Compl. at 19.  Count I alleges that MPS, through Article 15 and the MOA, is engaged in a "pattern or practice of discrimination . . . by classifying or limiting [its] employees based on race, color, or national origin" in violation of Section 703(a)(2) of Title VII. Compl. ¶¶ 79–80; 42 U.S.C. § 2000e-2(a)(2).  Count II also asserts a pattern-or-practice claim, averring that MPS is violating Section 703(a)(1) of Title VII by "implement[ing] preferences based on race, color, national origin, or sex" as required by the MOA. Compl. ¶ 84; 42 U.S.C. § 2000e-2(a)(1).

MPS does not deny that the challenged provisions require it to discriminate in favor of black teachers and against white teachers on the basis of race.  *See* Tr. 30:10–13. It contends, however, that the discrimination is lawful, voluntary, and remedial under *United Steelworkers of America v. Weber*, 443 U.S. 193 (1979), and *Johnson v. Transportation Agency of Santa Clara County*, 480 U.S. 616 (1987).  *See* Defts.' Mem. at 24–28, ECF No. 10; Tr. 30:16–31:8.  The Court has its doubts, but the Court need not reach the merits of this

dispute because the United States's complaint must be dismissed for jurisdictional and procedural reasons.

## II.   ANALYSIS

### A. Rule 12(b)(1)

#### 1.  Standard of Review

MPS first seeks dismissal under Fed. R. Civ. P. 12(b)(1), arguing that the Court lacks subject-matter jurisdiction.  "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial' attack and a 'factual attack'" on its jurisdiction.  *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).  When ruling on a facial attack, a court is restricted "to the face of the pleadings."  *Id.*  But when "the existence of subject matter jurisdiction [is challenged] in fact," a court is free to consider "matters outside the pleadings, such as testimony and affidavits."  *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914–15 (8th Cir. 2015) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)) (alteration in original).

Because MPS submits declarations and exhibits in support of its jurisdictional arguments, the Court construes MPS's motion as raising a factual challenge.  *Cf. Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 811 (3d Cir. 1989) ("A determination of mootness is an intensely factual inquiry.") (quotation omitted); *Glow In One Mini Golf, LLC v. Walz*, 37 F.4th 1365, 1372 (8th Cir. 2022) ("[W]e must engage in a fact-specific analysis to determine if the issue is capable of repetition yet evading review.").  The

Court will therefore look beyond the complaint and consider the materials submitted by the parties. *Disability Support All. v. Heartwood Enters., LLC*, 885 F.3d 543, 547 (8th Cir. 2018).

### 2. Article III Standing

"Federal courts are courts of limited jurisdiction and can only hear actual 'cases or controversies' as defined under Article III of the Constitution." *Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994); *see also* U.S. Const. art. III § 2. No "case or controversy" exists unless a plaintiff demonstrates that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An "injury in fact" is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "At the pleadings stage, general factual allegations suffice to support standing." *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022). Nonetheless, "Article III standing requires a concrete injury even in the context of a statutory violation," *Spokeo*, 578 U.S. at 341, and a court "cannot treat an injury as 'concrete' for Article III purposes based only on Congress's say-so," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 999 n.2 (11th Cir. 2020)).

MPS raises two threshold arguments.  First, it contends that the United States lacks Article III standing to challenge the CBA provisions because the United States has not identified a single teacher who was excessed, laid off, denied reinstatement, or otherwise harmed because of her race under Article 15 or the MOA.  Defts.' Mem. at 10–14.  Second, MPS argues that any claims concerning the Black Men Teach MOA are moot because the MOA expired by its own terms nearly six months before this action was filed.  *See id.* at 14–15; Defts.' Reply at 9–11, ECF No. 17.  The Court addresses each argument in turn.

### a.  Article 15

MPS argues that the United States has failed to allege an injury-in-fact because Article 15's race-based exceptions have never been applied.  *See* Tr. 6:5–11; Letter, ECF No. 20 (confirming that "the challenged contractual language" has never been "applied to determine whether a teacher was excessed or laid off").  But Article 15 is not a historical artifact or a dormant policy; it is part of a binding contract that *currently* defines the legal rights of every teacher—black and white—employed by the Minneapolis Public Schools.  Under Article 15, white teachers have weaker seniority rights than black teachers.  *See* Tr. 38:10–25.  This disparity does not spring into existence only if excessing occurs.  It exists *right now*—and will continue to exist as long as the CBA remains in force.

To illustrate the point:  Suppose that the CBA obligated MPS to purchase $100,000 life-insurance policies for black teachers and $50,000 life-insurance policies for white teachers.  A court would not need to wait for a white teacher to die—and her beneficiary to collect the proceeds of her life-insurance policy—before hearing a challenge to that disparity.  A black teacher who has $100,000 in protection against a death that may or may not occur during the term of the CBA has a *present* advantage over a white teacher who has $50,000 in protection.  Likewise, a black teacher who has strong protection against a layoff that may or may not occur during the term of the CBA has a *present* advantage over a white teacher who has weaker protection.  This is a sufficiently concrete injury for purposes of Article III, even if the white teacher is never actually excessed because of her race.  *Cf. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (holding that "the inability to compete on an equal footing," not the loss of an ultimate benefit, was a sufficient injury-in-fact).

MPS's citation to out-of-district authority is instructive only by contrast.  In *United States v. City of Tampa*, the city had repealed its allegedly discriminatory parental-leave policy five years before the government sued, and there was no evidence that the city was under any legal obligation to resume the discarded policy.  739 F. Supp. 3d 1055, 1064–65 (M.D. Fla. 2024).  Here, MPS made a legally enforceable promise, and the United States alleges a concrete, presently existing disparity in legal rights between

black teachers and white teachers.  This is plainly sufficient to give this Court jurisdiction under Article III.[3]

### b.  Black Men Teach MOA

The Black Men Teach MOA is a different matter.  "An actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (quotation omitted).  And a dispute "which became moot before the action commenced" cannot be heard at all.  *Renne v. Geary*, 501 U.S. 312, 320 (1991); *see also Brandywine, Inc. v. City of Richmond*, 359 F.3d 830, 836 (6th Cir. 2004) ("We can neither declare unconstitutional nor enjoin the enforcement of a provision that is no longer in effect.").  Unlike Article 15, the MOA does not presently have any impact on any teacher—black or white.  The MOA expired by its own terms nearly six months before the United States filed its complaint.  CBA at 235.

True, the United States seeks only *prospective* relief—specifically, an injunction prohibiting MPS "from further violating Title VII by implementing" the MOA or by "entering into . . . any contractual provision that is substantially similar . . . in any future

---

[3]Whether the complaint adequately states a claim under Section 707(a) is a different question.  Section 707(a) authorizes the Attorney General to sue a government entity "engaged in a pattern or practice of resistance" to Title VII rights.  42 U.S.C. § 2000e-6(a).  It is unclear whether a government entity engages in a "pattern or practice" of discrimination when it enters into a single CBA whose terms discriminate against multiple teachers based on their race.  *Cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977) (noting that a pattern-or-practice claim requires "more than the mere occurrence of isolated, accidental, or sporadic discriminatory acts").  But this is a merits question that the Court need not reach.

CBA with the union." Compl. at 19.[4]  For this Court to have jurisdiction to grant such relief, though, the United States must identify "some cognizable danger of recurrent violation"—that is, "something more than the mere possibility" of future harm.  *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).  Therefore, unless an exception applies, any challenge to the MOA is moot.

The United States invokes the voluntary-cessation exception to the mootness doctrine, arguing that MPS "voluntarily chose not to renew the agreement" only after "the United States notified [MPS] of its determination that the[] contested terms were unlawful."  Pl.'s Resp. at 24–25, ECF No. 15; *see also* Jones Decl. ¶¶ 2–4, ECF No. 16; Compl. ¶ 86.  Under this exception, courts will "deny the mootness defense to a defendant who may be seeking to 'engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends.'"  *LaBatte v. Gangle*, 161 F.4th 1109, 1117 (8th Cir. 2025) (quoting *Already, LLC*, 568 U.S. at 91).  This argument fails twice over.

---

[4]Gesturing to its catch-all request for "all such other additional relief as the interests of justice may require," Compl. at 19, the United States suggests that it *also* seeks retroactive relief because "[d]iscovery may reveal MPS teachers who suffered injury" under the MOA.  Pl.'s Resp. at 25, ECF No. 15; *see also* Tr. 53:4–11.  But the United States cannot establish jurisdiction by hypothesizing about what discovery "may reveal"—especially when the complaint nowhere alleges that the MOA was ever applied.  In any event, this argument fails on its own terms.  A plaintiff "must demonstrate standing separately for each form of relief sought." *TransUnion*, 594 U.S. at 431.  Therefore, any past injury "reveal[ed]" during discovery could not revive any claim for prospective relief.

First, there was no cessation—voluntary or otherwise.  The MOA's expiration date was fixed by the parties when they executed the agreement in July 2024, which was nearly ten months *before* the United States sent its initial "notice of investigation" letter on May 5, 2025.  CBA at 235; Jones Decl. Ex. 1, ECF No. 16-1.  Thus, the MOA could not have ended in response to any threatened litigation.  *See, e.g., Church of the Word v. Page*, No. 4:20-CV-0671-SEP, 2020 WL 9723025, at *2 (E.D. Mo. May 31, 2020) (holding that a plaintiff could not "rely on the 'voluntary cessation' or 'capable of repetition yet evading review' doctrines to manufacture" a controversy that did not exist "at the time of filing").  Moreover, MPS cannot unilaterally "pick up where [it] left off." *LaBatte*, 161 F.4th at 1117.  Any reinstatement of the MOA or a similar agreement would require a new, three-party agreement.

Second, even treating the expiration and non-renewal of the MOA as a "cessation," the exception is still inapplicable.  The United States relies on the Supreme Court's opinion in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000), and in particular on the Court's assertion that "[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 189; *see also* Pl.'s Resp. at 24, ECF No. 15 (also citing *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007)).  But the United States ignores more recent cases clarifying that the exception will rarely revive a case when the defendant is a government entity and the

-12-

allegedly wrongful behavior is a government policy.  For instance, in *Young America's Foundation v. Kaler*, the Eighth Circuit held that a repealed or superseded government policy will not keep a controversy alive "merely because the governing body has the power to reenact the policy after the lawsuit is dismissed."  14 F.4th 879, 886 (8th Cir. 2021).  "Instead, 'the exceptions are rare and typically involve situations where it is virtually certain that the repealed policy will be reenacted.'" *Id.* (quoting *Teague v. Cooper*, 720 F.3d 973, 977 (8th Cir. 2013)) (cleaned up); *see also Prowse v. Payne*, 984 F.3d 700, 703 (8th Cir. 2021).

In *Kaler*, the Eighth Circuit placed the burden on the plaintiff to "show[] that it is 'virtually certain' that the [policy] will be reenacted."  *Kaler*, 14 F.4th at 887 (quoting *Teague*, 720 F.3d at 977).  Here, the record shows that the MOA was not extended, renewed, or replaced, and that the successor CBA contains no similar provision.  *See* Second Miller Decl. Ex. 5, ECF No. 22-1; Tr. 48:18–20 (conceding that "this might be a different case if we had a finalized CBA that didn't have a renewal").  Against all of this, the United States offers only its observation that "school district proposals and agreements with third parties . . . could be . . . renewed again . . . at some certain point."  Tr. 52:13–19.  Speculation about what three parties "could" do "at some . . . point" is a long way from "virtual[] certain[ty]."  *Kaler*, 14 F.4th at 887.  Accordingly, the voluntary-cessation doctrine cannot save the United States's claim.

The "capable of repetition, yet evading review" exception fares no better.  *See, e.g., Iowa Prot. & Advocacy Servs. v. Tanager, Inc.*, 427 F.3d 541, 544 (8th Cir. 2005).  This "narrow exception" applies only if (1) there is "a reasonable expectation that the same complaining party will be subjected to the same action again" *and* (2) the challenged conduct is "of a duration too short to be fully litigated" before the lawsuit becomes moot.  *Id.*  The first element fails for the reasons just discussed:  There is not a reasonable expectation that the three parties to the expired MOA will execute a similar agreement in the future.  The second fails because the MOA is not the kind of "exceptional circumstance" that is so short-lived as to evade legal scrutiny.  *Epp v. Kerrey*, 964 F.2d 754, 755 (8th Cir. 1992); *see also Tanager*, 427 F.3d at 544.  After all, the MOA was in force for nearly a year, and it was embedded in a two-year CBA that was negotiated over several months.  *See* Compl. ¶ 13 n.3 (citing published meeting minutes ratifying 2023–2025 CBA); *cf. Neighborhood Transp. Network*, 42 F.3d at 1173 (concluding that a challenge to a highway construction project was not "capable of repetition, yet evading review" because "[f]uture projects may be sufficiently time-consuming so as to permit review").  The United States's challenge to the MOA is therefore dismissed as moot under Fed. R. Civ. P. 12(b)(1).

### B. Rule 12(b)(7)

### 1. Standard of Review

Returning to the United States's challenge to Article 15:  MPS also seeks dismissal of this claim pursuant to Fed. R. Civ. P. 12(b)(7).  Specifically, MPS argues that the Union is a required party in whose absence the case cannot proceed.  When deciding whether to grant a Rule 12(b)(7) motion, a court must follow a three-step process:  First, the court must determine whether the absent party is "required" under Fed. R. Civ. P. 19(a).  Second, if the party is required, the court must determine whether joinder of the party is feasible.  *See Gwartz v. Jefferson Mem'l Hosp. Ass'n*, 23 F.3d 1426, 1428 (8th Cir. 1994).  And third, if joinder is not feasible, the court must "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P. 19(b).  In making these determinations, a court may consider matters outside of the pleadings.  *Dou Yee Enters. (S) PTE, Ltd. v. Advantek, Inc.*, 149 F.R.D. 185, 187 (D. Minn. 1993).

### 2. Rule 19(a)

To begin, the Court must determine if the Union is a required party under Fed. R. Civ. P. 19(a)(1).  A person is a "required" party if:

> (A)    in that person's absence, the court cannot accord complete relief among existing parties; or

> (B)    that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

-15-

> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Rule 19(a)(1).

This is not a difficult question in this case. The United States does not allege that MPS has applied neutral contract language in a discriminatory way. Rather, it alleges that Article 15 discriminates on its face, asks this Court to declare Article 15 unlawful, and seeks to enjoin any enforcement of Article 15. Courts have long recognized that when a challenge is made to the lawfulness of the *terms* of a collective-bargaining agreement—as opposed to a particular *application* of those terms—the union is a required party. *See, e.g., Nat'l Org. for Women, Inc. v. Minn. Mining & Mfg. Co.*, 73 F.R.D. 467, 469 (D. Minn. 1977) (concluding that joinder was required when allegedly discriminatory practices "may be embodied in provisions of the collective bargaining agreements which were negotiated by and between [the defendant] and the two unions" and it was "clear that at least some of the relief which the plaintiffs seek may affect the rights and interests of the unions"); *Ware v. City of Buffalo*, 186 F. Supp. 2d 324, 330 (W.D.N.Y. 2001) ("Obviously the union, as the bargaining representative of its members, has a great interest in the court's determination" whether the terms of a

collective-bargaining agreement were "null and void."); 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1620 (3d ed. Apr. 2026 update).

Here, the United States all but admits that the Union has an interest in the CBA. *See* Tr. 60:16–62:3. The United States could hardly argue otherwise, as the Union is a signatory to both the CBA and the MOA, and the Union's members are the intended beneficiaries of those agreements. Moreover, it is the Union (not MPS) that holds exclusive-representative status for Minneapolis teachers and is statutorily obligated "to meet and negotiate with" MPS "on behalf of all employees." Minn. Stat. § 179A.03, subd. 8.

Nonetheless, the United States argues that the Union's interests are adequately represented by the existing defendants. *See* Pl.'s Resp. at 28 ("Defendants' interests in this matter are essentially aligned with the Union's."). The Court disagrees. MPS and the Union sit on opposite sides of the bargaining table, and the Court cannot simply trust that one party to a CBA will safeguard the interests of the other party.

Finally, the United States suggests that even if the Union has an *interest*, that interest is not *protectable* because the Union has no right to preserve "illegal" contractual provisions and, in any event, the challenged provisions are severable from the rest of the CBA. Pl.'s Resp. at 27–31. Both arguments put the cart before the horse. While the Union has no right to include unlawful provisions in a CBA, it has every right to be heard about *whether* a provision is unlawful. And the Union's interest in being heard

-17-

about the legality of Article 15 does not disappear merely because, if Article 15 is found to be unlawful, the rest of the CBA will remain intact.

As to Rule 19(a)(1)(B)(ii), the Union's absence would obviously expose MPS to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Because any judgment from the Court would bind MPS—but not the Union—MPS would be left in the "untenable position" of choosing whether to violate a federal injunction or violate the terms of the CBA. Tr. 43:9–12. If MPS complies with the Court's order, the Union would have every right to file a "grievance demanding MPS comply with the CBA" or "an unfair labor practice charge against MPS for unilaterally altering or failing to honor negotiated terms." Defts.' Mem. at 32; *see also* Minn. Stat. § 179A.13, subd. 2; *Nat'l Org. for Women*, 73 F.R.D. at 469–70 (noting the risk that "the company's obligations under the collective bargaining agreements with the unions might be substantially inconsistent with the obligations imposed on it by the court"). The Court thus concludes that the Union is a required party.

### 3. Rule 19(b)

#### a. Feasibility of Joinder

Because the Union is a required party under Rule 19(a), the Court must ask whether joinder is feasible. *Gwartz*, 23 F.3d at 1427. It is not—and the reason why it is not lies in Congress's division of enforcement authority between the Attorney General and the Equal Employment Opportunity Commission (the "EEOC").

As enacted in 1964, Section 707(a) authorized only the *Attorney General* to bring pattern-or-practice suits. *See EEOC v. CVS Pharm., Inc.*, 809 F.3d 335, 339 (7th Cir. 2015). But in 1972, Congress restructured Title VII enforcement. *See id.*; Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103. First, Congress extended Title VII's reach "to include state and local government employers." *United States v. Fresno Unified Sch. Dist.*, 592 F.2d 1088, 1090–91 (9th Cir. 1979); *see also* 42 U.S.C. § 2000e(a). Second, Congress transferred the Attorney General's enforcement authority under Section 707 to the EEOC, thereby subjecting such actions to Section 706's charge, investigation, and conciliation procedures. *Fresno Unified Sch. Dist.*, 592 F.2d at 1091; *see also* 42 U.S.C. § 2000e-6(c).

This transfer created an anomaly: The EEOC—which alone had authority to bring pattern-or-practice suits—did not have authority to sue government entities. *See Fresno Unified Sch. Dist.*, 592 F.2d at 1091–92. Effectively, then, Congress insulated government entities from pattern-or-practice suits. To resolve this anomaly, President Jimmy Carter submitted Reorganization Plan No. 1 of 1978 to Congress, thereby "transferr[ing] to the Attorney General any authority the EEOC may have assumed in 1974 to bring [pattern-or-practice] suits against public employers." *Fresno Unified Sch. Dist.*, 592 F.2d at 1091–92; *see also* Reorganization Plan No. 1 of 1978, § 5, 92 Stat. 3781; *compare* 42 U.S.C. § 2000e-5(f)(1), *with id.* § 2000e-6(c), (e).

Here, as the United States concedes, the Union cannot be joined as an "adverse defendant" because it is a private labor organization. Pl.'s Resp. at 32; *see also* 42 U.S.C. § 2000e-6(e). That should be the end of the matter, but the United States proposes that the Union instead be joined as a "non-liability party for the limited purpose of effectuating complete relief between the existing parties and defending the interests of the joining party." *Id.* In support of its proposal, the United States cites two cases brought by the EEOC against private entities: *EEOC v. Peabody Western Coal Co.*, 610 F.3d 1070, 1079 (9th Cir. 2010), and *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974). But neither case authorizes the kind of joinder the United States proposes here. In each case, the EEOC sued a private employer, on a proper charge, and based on the *application* (not facial *legality*) of contract terms. *See Peabody*, 610 F.3d at 1075–76 (challenging the implementation of Navajo hiring preference contained in mining leases); *MacMillan Bloedel Containers*, 503 F.2d at 1088, 1095 (clarifying that "[t]he Union is not charged with a Title VII violation and no relief is sought against it"). In each case, the contract was collateral to the Title VII claim, not the target of it.

More fundamentally, the United States never explains how its "non-liability party" proposal would work, and it struggled to answer the Court's questions about its proposal at the hearing. *See* Tr. 64:22–67:17. If the Union could *not* be bound by the Court's judgment, then its joinder would presumably accomplish nothing because MPS would still be subject to inconsistent legal obligations. Fed. R. Civ. P. 19(a)(1)(B)(ii).

And if the Union *could* be bound by the Court's judgment, then the Attorney General would effectively gain, through the side door of Rule 19, a judgment against a private party that Congress explicitly placed beyond the Attorney General's reach. The Court declines to accept the United States's proposal.

### b. Equity and Good Conscience

The Court must therefore determine whether, in "equity and good conscience," this case should proceed without the Union. Fed. R. Civ. P. 19(b). Rule 19(b) identifies several non-exclusive factors to help guide this inquiry, including: (1) the extent to which a judgment might prejudice the absent party or existing parties; (2) whether such prejudice could be lessened or avoided by protective provisions, shaping the relief, or other measures; (3) whether a judgment would be adequate; and (4) whether the plaintiff would have an adequate alternative remedy in the case of dismissal. Fed. R. Civ. P. 19(b)(1)–(4); *see also Republic of Phil. v. Pimentel*, 553 U.S. 851, 862 (2008). "[T]he determination whether to proceed will turn upon factors that are case specific, which is consistent with a Rule based on equitable considerations." *Pimentel*, 553 U.S. at 862–63; *see also Fort Yates Pub. Sch. Dist. No. 4 v. Murphy ex rel. C.M.B.*, 786 F.3d 662, 671 (8th Cir. 2015) (describing the Rule 19 inquiry as "a highly-practical, fact-based endeavor").

The first three factors mitigate in favor of dismissal for many of the reasons discussed above. With respect to prejudice, the Court has already concluded that the Union's absence would, as a practical matter, impair its ability to protect its bargained-

for interests and to fulfill its statutory obligations to MPS teachers.  *See, e.g., Nat'l Org. for Women*, 73 F.R.D. at 469–70; *cf. Kickapoo Tribe v. Babbitt*, 43 F.3d 1491, 1497 n.9 (D.C. Cir. 1995) ("The inquiry as to prejudice under Rule 19(b) is the same as the inquiry under Rule 19(a)(2)(i) regarding whether continuing the action will impair the absent party's ability to protect its interest").  And there is no way to shape the relief to lessen or avoid that prejudice.  For the United States to prevail, the Court must invalidate part of the CBA, and because the Union is a party to the CBA, invalidating part of the CBA would unavoidably impact the Union's interests.

With respect to the adequacy of judgment:  Adequacy in this context refers not to the satisfaction of the plaintiff's claims, but to the public's interest "in the efficient administration of justice and the avoidance of multiple litigation."  *Pimentel*, 553 U.S. at 870 (quotation omitted).  Any judgment in this case would disserve the public interest for the reasons already explained:  A judgment binding MPS alone could leave it subject to conflicting court-ordered and contractual obligations, while the Union—unbound by any judgment—would be free to relitigate the lawfulness of Article 15.  Thus, proceeding without the Union "would not further the public interest in settling the dispute as a whole because [the Union] would not be bound by the judgment in an action where [it was] not [a] part[y]."  *Id.*

Only the final factor—whether the United States has an adequate alternative remedy—gives the Court pause.  As explained at the hearing, the Court has grave

doubts about the legality of the racial discrimination in which MPS is forced to engage

pursuant to Article 15.  *See* Tr. 34:4–36:23.  Generally speaking, a provision requiring a

government entity to discriminate on the basis of race is lawful only if it is clearly

written, narrowly tailored, and necessary to remedy past discrimination by that entity.

*See United Steelworker*, 443 U.S. 193; *Johnson*, 480 U.S. 616.  Article 15 does not appear to

meet the first two criteria—MPS cannot even identity the "populations" to which it

applies—and MPS appears to have done little or nothing to inquire into whether

Article 15 meets the third requirement.  Dismissing this case may leave the United

States without the ability to bring a facial challenge to Article 15.  That is a significant

concern, but three considerations blunt its force:

*First*, when the "prejudice to the absent entit[y]" is sufficiently serious, the

Supreme Court has endorsed dismissal under Rule 19(b) even if it "will mean, in some

instances, that plaintiffs will be left without a forum for definitive resolution of their

claims."  *Pimentel*, 553 U.S. at 872.

*Second*, any lack of remedy for the United States is the direct result of decisions

made by Congress.  The United States may be correct that the Court's holding could

shield discriminatory provisions of a public employer's CBA from a pattern-or-practice

attack.  But through the 1972 Amendments and the 1978 Reorganization Plan, Congress

placed private entities—including labor organizations— beyond the reach of the

Attorney General's enforcement authority under Section 707(a). If that is a problem, the solution has to come from Congress.

*Finally*, any discrimination wrought by Article 15 can be challenged, because any aggrieved teacher may file a charge with the EEOC. *See* Tr. 68:23–69:21 (conceding that the government would "have other ways to attack the allegedly illegal provisions of the CBA," such as a Section 706 claim, but arguing that "would be . . . in a totally different context"). As the Court has explained, Article 15 presently harms white teachers even though MPS has not yet laid off a more-senior white teacher in place of a less-senior black teacher under its provisions. *Id.* 20:3–14. And, of course, if Article 15 is ever implemented, the more-senior white teacher who is laid off because of her race can file a charge with the EEOC. In effect, the only "remedy" the United States loses as a result of the Court's ruling is its preferred vehicle for enforcement—that is, a pre-enforcement, facial attack on the terms of a CBA, brought without any charging party. Rule 19(b) asks only whether the plaintiff would have an "adequate" remedy, not a remedy that is identical or preferred. Fed. R. Civ. P. 19(b)(4).

The United States responds that "dismissal would allow the plainly racial classifications [in the CBA] to remain, which would be severely prejudicial to the United States and the public interest in the fair enforcement of civil rights law under Title VII." Pl.'s Resp. at 28. Once again, the cart precedes the horse. MPS concedes that Article 15's classifications are discriminatory, but it strongly disputes whether that

-24-

discrimination is *unlawful*. *See* Tr. 30:10–13. The government's argument regarding prejudice assumes the answer to a question that has not yet been litigated. The Court will not discard the Union's contractual rights without affording it the chance to defend those rights on the merits, nor will it accept the government's confidence in its own claims as a substitute for full and fair adjudication. *See, e.g., EEOC v. U.S. Pipe & Foundry Co.*, 375 F. Supp. 237, 245, 247–49 (N.D. Ala. 1974).

For these reasons, the Court concludes that this action cannot proceed "in equity and good conscience" without the Union. Fed. R. Civ. P. 19(b). The Court therefore grants MPS's motion under Rule 12(b)(7) and dismisses all remaining claims without prejudice.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Defendants' motion to dismiss [ECF No. 8] is GRANTED IN PART and DENIED AS MOOT IN PART.

2.  Plaintiff's complaint [ECF No. 2] is DISMISSED WITHOUT PREJUDICE pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(7).

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: August 10, 2026                    /s/ Patrick J. Schiltz
                                          Patrick J. Schiltz
                                          United States District Judge

-25-